**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Prime Success, L.P., | Case No.: _____ |
| Petitioner, | |
| -against- | |
| Sinovac Biotech Ltd., 1Globe Capital LLC, OrbiMed Advisors LLC, OrbiMed Capital LLC, OrbiMed Partners Master Fund Ltd., | |
| Respondents, | |
| -and- | |
| Equiniti Trust Company LLC, Cede & Co., and the Depository Trust Company, | |
| Relief Respondents. | |

## VERIFIED PETITION OF PRIME SUCCESS, L.P., FOR
## EMERGENCY INJUNCTIVE RELIEF IN AID OF ARBITRATION

Petitioner Prime Success, L.P. ("Prime Success" or "Petitioner"), in furtherance of its

Petition for Emergency Injunctive Relief in Aid of Arbitration pursuant to Rules 64 and 65 of the

Federal Rules of Civil Procedure, the Convention on the Recognition and Enforcement of Foreign

Arbitral Awards as implemented at 9 U.S.C. § 201 *et seq.*, and Rule 7502(c) of the New York Civil

Practice Law and Rules ("CPLR") (the "Petition") against Respondents Sinovac Biotech, Ltd.

("Sinovac" or the "Company"), 1Globe Capital LLC ("1Globe"), OrbiMed Advisors LLC,

OrbiMed Capital LLC, and OrbiMed Partners Master Fund Ltd. ("OrbiMed," and with Sinovac

and 1Globe, "Respondents"), and Relief Respondents Equiniti Trust Company LLC ("Equiniti"),

Cede & Co., and the Depository Trust Company ("DTC," and with Equiniti and Cede & Co., the

"Relief Respondents"), alleges on knowledge as to its own acts and otherwise on information and belief, as follows:

## NATURE OF PROCEEDING

1.      This is a petition for preliminary injunctive relief in aid of foreign arbitrations in Hong Kong and Beijing, which fall under the New York Convention (the "Arbitrations").  *See* 9 U.S.C. § 201 *et seq*.  As discussed herein, the issuance of an immediate injunction to preserve the status quo, and an anti-suit injunction to allow the Arbitrations to proceed, is necessary to prevent Respondents from using self-help and their forum-shopping litigation in Antigua to render the Arbitrations and expected arbitration awards ineffectual.  Federal and New York law both authorize the Court to grant provisional relief in aid of foreign arbitrations, including an anti-suit injunction where, as here, one side seeks to avoid the agreed forum by filing suit in another jurisdiction.  Such relief is both necessary and urgent here.  Absent this Court's intervention, Respondents may succeed in rendering the pending Arbitrations illusory *within a matter of weeks*.

2.      The Arbitrations in Hong Kong and Beijing, and the underlying disputes that led to them, arise out of a years' long campaign of corporate malfeasance, violations of U.S. securities laws, and self-dealing by a band of hostile activist shareholders (including Respondents 1Globe and OrbiMed, among others) who went to a shareholder meeting in 2018 with secret plans to ambush and seize control over Respondent Sinovac, a vaccine manufacturer that is registered with the SEC and listed on the NASDAQ.  After an extensive campaign of fraud, forgery, and lies that took place for years, notwithstanding the SEC's successful prosecution of 1Globe for its numerous violations pursuant to this scheme, and even though several participants in the scheme are currently serving time in jail for their criminal misconduct, the hostile activists *succeeded* in seizing control over Sinovac a few months ago.  Sinovac is now acting as their instrument, and in recent weeks it

has (i) threatened to use unlawful self-help to deprive Petitioner, a longstanding shareholder of Sinovac, of both its right to vote and also hundreds of millions of dollars in dividends, and (ii) commenced an action in Antigua seeking to avoid the arbitral forums to which the parties agreed. Through these improper actions, 1Globe and OrbiMed hope to entrench their power at an upcoming shareholder vote scheduled for July 8, 2025, and seize for themselves the value that Petitioner created for Sinovac.

3.      This Court should not permit Respondents to do so, for these actions would render the pending Arbitrations ineffectual. To be clear, Petitioner is not asking this Court to **resolve** the complicated factual and legal disputes that give rise to the Arbitrations, which are governed by Hong Kong and PRC law. But this Court is expressly authorized by federal and New York law to grant relief to maintain the status quo while foreign arbitrations proceed. Prompt relief is necessary to prevent Respondents from rendering the Arbitrations illusory and ineffectual.

4.      The history of Sinovac and its legal troubles is long and tortured, but the material facts here are fairly straightforward. Petitioner Prime Success is a longstanding shareholder of Sinovac. In July 2018, Prime Success invested approximately $43 million in Sinovac through a Securities Purchase Agreement (the "SPA"). In May 2020, right after COVID hit, Prime Success invested another $7.5 million in a Sinovac affiliate through a Convertible Loan Agreement ("CLA"), with those funds earmarked to fund research into a COVID vaccine. These were arm's length transactions with the initial share price set by Houlihan Lokey, a third-party valuation firm, and another investor (Vivo) made equivalent investments both times. Those investments enabled Sinovac to quickly develop a COVID vaccine, called CoronaVac, which became the most-used COVID vaccine in the world, creating immense value for Sinovac. But now, by exercising their plenary control over Sinovac, 1Globe and OrbiMed are trying to seize all the value that Prime

Success and Vivo created—threatening to pay billions of dollars in dividends **on or before July 9, 2025** to all shareholders except for Prime and Vivo, whose dividends may be paid to other shareholders (including 1Globe and OrbiMed); threatening to deny Prime Success and Vivo the right to vote at an upcoming shareholder meeting **on July 8, 2025**, in order to entrench 1Globe's and OrbiMed's controlling power; and asking the courts of Antigua (where Sinovac is incorporated) to bless this misconduct in advance, by **as soon as June 20, 2025**, by precipitously invalidating Prime Success's and Vivo's investment agreements despite lacking any basis—or even jurisdiction—to do so.

5.      The courts of Antigua lack such jurisdiction because the investment agreements contain mandatory arbitration clauses providing that disputes over these instruments, including over their existence, and validity, must be arbitrated.  The July 2018 SPA with Sinovac mandates that "[a]ny dispute, claim, controversy or difference arising out of or in connection with [the SPA] or the transactions contemplated hereby, *including any question regarding its existence, validity*, interpretation, performance or termination or any dispute regarding any noncontractual obligation arising out of or in connection with it ... , shall be determined by arbitration administered by" the Hong Kong International Arbitration Centre ("HKIAC") under Hong Kong law.  Ex. 1, SPA § 6.10.[1]  Similarly, the May 2020 CLA with a Sinovac affiliate (now called Sinovac Life Sciences Co., Ltd. ("Sinovac L.S.")) mandates that "all disputes arising out of or in connection with this agreement shall," if not resolved through negotiations, "be settled at the China International Economic and Trade Arbitration Commission" (the "CIETAC") in Beijing, under PRC laws.  Ex. 2, CLA § 11.2.  The Guarantee Agreement ("GA") between Sinovac and Prime Success, and

---

[1]      All citations to "Ex." are to exhibits attached to the Declaration of K. McKenzie Anderson in support of this Petition.

Debt-To-Equity Conversion Agreement (the "DECA") between Sinovac L.S. and Prime Success, provide the same. Nevertheless, Respondents are suing in Antigua and threatening unilateral action to void Prime Success's investments as supposedly invalid, seeking to front-run the Arbitrations that will determine their validity.

6.      This is the *exact* circumstance where this Court is vested with the power and duty to intervene. Under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention"), this Court may "direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. Under controlling law, this Court may also grant provisional injunctive relief to safeguard the effectiveness of such arbitrations. Here, Respondents are determined to eliminate Prime Success's rights through their self-serving claims that its investment agreements were impliedly invalidated by a ruling in another case, relating to control over the Sinovac Board, that did not address or involve Prime Success at all. But while Respondents are welcome to pursue their self-serving challenge to the validity of Petitioner's investment agreements in the Arbitrations, they cannot deprive Prime Success of its shareholder rights while the Arbitrations are pending. Prime Success has been a major owner of registered, valid shares of Sinovac for seven years and it has undisputed rights as such—including the right to the same dividends as other shareholders, and the right to vote with other shareholders to boot 1Globe and OrbiMed out of power.

7.      Accordingly, Petitioner respectfully asks this Court to issue temporary and preliminary injunctive relief to maintain the status quo and stop Respondents from circumventing the mandatory arbitration agreements governing Petitioner's agreements with Sinovac, and to prevent the irreparable harm Petitioner will suffer if Sinovac proceeds on its current path.

## THE PARTIES

8.      Petitioner Prime Success is a Cayman Islands-registered limited partnership established to invest in Sinovac and Sinovac L.S.  Prime Success beneficially owns 5,851,423 shares of Sinovac's common shares, which represents approximately 8.14% of the outstanding common stock of Sinovac, based on 71,860,702 shares outstanding as reported in Sinovac's From 20–F filed with the SEC on April 29, 2024.  Prime Success also owns approximately 6.3% of the equity interests of Sinovac L.S.

9.      Respondent Sinovac Biotech Ltd. (previously defined as "Sinovac" or the "Company") is an Antiguan corporation headquartered in Beijing, China. Sinovac's registered address is Unit #4 Bryson's Complex, Friars Hill Road, St. John's, Antigua, with its principal executive offices in Beijing.  Its agent for service of process in the United States is Cogency Global Inc., located at 122 East 42nd Street, 18th Floor, New York, NY 10168.  Sinovac's common shares are registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12(b) of the Exchange Act and listed on the NASDAQ under the ticker symbol "SVA."

10.     Non-party Sinovac Life Sciences Co., Ltd. ("Sinovac L.S.") is an operating subsidiary of Sinovac that was formerly known as Sinovac Research and Development Co., Ltd. It is the counterparty to Prime Success on the CLA executed in May 2020 for a capital infusion to support the development of CoronaVac and the subsequent DECA in which Prime Success's debt interest was converted to equity.

11.     Respondent 1Globe Capital LLC (previously defined as "1Globe") is a Delaware limited liability company with its principal place of business at One International Place, 44th Floor, Boston, MA. According to its most recent public disclosures, 1Globe beneficially owns 18,515,315 shares of Sinovac's common stock, which represents approximately 25.8% of the outstanding

common stock of Sinovac, based on 71,860,702 shares outstanding as reported in Sinovac's From 20–F filed with the SEC on April 29, 2024.

12.    1Globe has filled and/or claims the right to fill two of the Company's five director positions.  Until two weeks ago, its designees were:  (1) Jiaqiang "Chiang" Li ("Li"), who was installed as a director and Chairman on or around February 28, 2025; and (2) Pengfei Li, who is the head of 1Globe China.  Li is the owner of 1Globe and resides in Massachusetts; Pengfei Li currently resides in a detention center in China, serving an eight-year sentence for his criminal conduct relating to Sinovac.  Until he resigned approximately two weeks ago, he served as a Company director from his jail cell.

13.    Respondent OrbiMed Advisors LLC ("OrbiMed Advisors") is a Delaware limited liability company with its principal place of business in New York City, NY.  According to its most recent public disclosures, OrbiMed Advisors beneficially owns 1,219,500 shares of Sinovac's common stock, which represents approximately 1.7% of the outstanding common stock of Sinovac, based on 71,860,702 shares outstanding as reported in Sinovac's From 20–F filed with the SEC on April 29, 2024.

14.    Respondent OrbiMed Capital LLC ("OrbiMed Capital") is a Delaware limited liability company with its principal place of business in New York City, NY.  According to its most recent public disclosures, OrbiMed Capital beneficially owns 1,448,000 shares of Sinovac's common stock, which represents approximately 2% of the outstanding common stock of Sinovac, based on 71,860,702 shares outstanding as reported in Sinovac's From 20–F filed with the SEC on April 29, 2024.

15.    Respondent OrbiMed Partners Master Fund Ltd. ("OrbiMed Partners," and together with OrbiMed Advisors and OrbiMed Capital, "OrbiMed") is an exempted company registered in

Bermuda, which on information and belief shares its principal place of business in New York City, NY with the other OrbiMed entities.

16.     Although it owns less than 4% of Sinovac, OrbiMed has filled another two of the Company's five director slots, giving 1Globe and OrbiMed plenary power over Sinovac. OrbiMed's designees are: (1) David Guowei Wang, who was installed as a director on or around February 28, 2025; and (2) Sven Borho, who was installed as a director on or around March 28, 2025. Wang is a Partner and Senior Managing Director at OrbiMed Advisors; Borho is a founder and Managing Partner of OrbiMed Advisors.

17.     Relief Respondent Depository Trust Company ("DTC") is a New York corporation headquartered in New York City. It is the central depository of Sinovac's NASDAQ-listed securities, and it holds, tracks, maintains, and custodies the total fungible bulk of securities issued by Sinovac. DTC keeps books and records documenting the number and types of shares issued by Sinovac, as well as the beneficial ownership and transfers of common stock, preserves the original stock certificates of Sinovac (or one jumbo or global certificate), and acts as a clearinghouse for all securities issued by Sinovac. DTC also administers and manages communications between Sinovac and its shareholders. Petitioner names DTC as a Relief Respondent solely to ensure that any relief provided by the Court is effective.

18.     Relief Respondent Cede & Co. is a New York partnership. Cede & Co. is the subsidiary nominee of DTC and holds legal (but not equitable) title to 5,851,422 of the individual Sinovac shares owned by Petitioner Prime Success. Petitioner names Cede & Co. as a Relief Respondent solely to ensure that any relief provided by the Court is effective.

19.     Relief Respondent Equiniti Trust Company LLC is incorporated in New York, with its headquarters located at 48 Wall Street, 22nd floor, New York, New York. It has been retained

to serve as Sinovac's paying agent for the administration and payment of dividends at the Company's instructions.  Petitioner names Equiniti as a Relief Respondent solely to ensure that any relief provided by the Court is effective.

20.     Non-party Vivo Capital LLC, a limited liability company organized under the laws of Delaware, is similarly situated to Prime Success, having invested in Sinovac and Sinovac L.S. at the same time and in the same amounts as Prime Success. Vivo Capital LLC subsequently assigned its rights under the 2018 SPA and transferred the Sinovac shares it purchased in connection with that agreement to Vivo Capital Fund VIII, L.P., Vivo Capital Surplus Fund VIII, L.P., and Vivo Capital Fund IX, L.P (together with Vivo Capital LLC, "Vivo").

## JURISDICTION AND VENUE

21.     Sinovac and Prime Success entered into a valid and binding SPA that mandates dispute resolution by arbitration in Hong Kong, specifying that the arbitral award "may be entered in any Court having competent jurisdiction thereof."  Ex. 1, SPA § 6.10.  Separate from the arbitration provision, the parties agreed that if any provisions of the SPA "are not performed in accordance with their specific terms or are otherwise breached, irreparable damage would occur, no adequate remedy at Law would exist and damages would be difficult to determine," thus warranting "an injunction or injunctions to prevent breaches of this Agreement and [] specific performance of the terms hereof," and waived any requirement for a bond and also "the defense of adequacy of a remedy at Law."  Ex 1, SPA § 6.12.  Prime Success has the rights of a shareholder in Sinovac pursuant to this agreement.

22.     Sinovac L.S. and Prime Success entered into a valid and binding CLA and DECA, which both mandate dispute resolution by arbitration in Beijing. Ex. 2, CLA § 11.2.  Prime Success has the rights of a shareholder in Sinovac L.S. pursuant to these agreements.  In addition, Sinovac

and Prime Success entered into a valid and binding GA pertaining to the CLA between Sinovac L.S. and Prime Success, which also contains a mandatory arbitration clause providing for dispute resolution by arbitration in Beijing.

23.     This Court has jurisdiction to grant injunctive relief to prevent Respondents from rendering the Arbitrations under these agreements ineffectual pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as implemented at 9 U.S.C. §§ 201–208, because the agreements at issue contain an "arbitration agreement ... arising out of a legal relationship ... which is considered as commercial" and not "entirely between citizens of the United States." *Id.* § 202. "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." *Id.* § 203. "The district courts of the United States ... shall have original jurisdiction over such an action or proceeding[.]" *Id.*; *see also id.* § 206 (authority to compel arbitration and appoint arbitrators).

24.     The SPA, CLA, GA, and DECA all fall under the Convention because they are commercial contracts, not entirely between U.S. citizens, containing arbitration agreements. In the SPA, Sinovac and Prime Success agreed that all disputes "regarding its existence, validity, interpretation, performance or termination or any dispute regarding any noncontractual obligation arising out of or in connection with it (a 'Dispute'), shall be determined by arbitration administered by" HKIAC. Ex. 1, SPA § 6.10(b). In the CLA and DECA, Sinovac L.P. and Prime Success agreed that "[a]ll disputes arising out of or in connection with this agreement shall ... be settled at the ... CIETAC." Ex. 2, CLA § 11.2. In the GA, Sinovac and Prime Success likewise agreed that "[a]ll disputes arising out of or in connection with this agreement shall ... be settled at the ... CIETAC." Ex. 20, GA.

25.    A request for injunctive relief in aid of an arbitral agreement that falls under the Convention is "[a]n action or proceeding" "falling under the Convention," 9 U.S.C. § 203, and this Court thus has subject matter jurisdiction, *see Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 826 (2d Cir. 1990) (holding that "entertaining an application for a preliminary injunction in aid of arbitration is consistent with the court's powers pursuant to § 206"); *Venconsul N.V. v. Tim Int'l N.V.*, 2003 WL 21804833, at *3 (S.D.N.Y. Aug. 6, 2003) ("*Borden* has been interpreted as recognizing a court's power to entertain requests for provisional remedies in aid of arbitration even where the request for remedies does not accompany a motion to compel arbitration or to confirm an award.").

26.    This Court has specific personal jurisdiction over Sinovac pursuant to New York's long-arm statute, CPLR 302, due to its extensive relevant contacts with this forum.  Sinovac conducts substantial business in New York that is directly related to Prime Success's claim to preserve the status quo, including:

(i)    Sinovac has registered and listed its stock on the NASDAQ, and has been actively negotiating with the NASDAQ regarding its potential delisting as a result of the actions taken by Sinovac's current Board of Directors, directed at Prime Success, which are the subject matter of this Petition, *see* Ex. 9, *Sinovac Announces New Board Pursuant to Privy Council Judgment* (Feb. 28, 2025);

(ii)    Sinovac uses agents in New York City to control and direct the property rights and interests at stake in this Petition, including (a) Sinovac's securities depository and clearing agent DTC, which maintains Sinovac's stock register and is the central repository for Sinovac's total stock issuance, including the shares held by Prime Success that Sinovac has said it will not honor, and (b) Sinovac's paying agent

Equiniti, which has received or will soon receive the funds for dividends to be issued to current stockholders, including Prime Success, which Sinovac has said it will not pay to Prime Success[2]; and

(iii)  Current Sinovac directors David Wang and Sven Borho have conducted their official duties as members of the Sinovac Board and members of its Audit Committee while working from New York, where Borho resides, for OrbiMed, a New York-based firm.  Prime Success's claim to preserve the status quo while the Arbitrations proceed directly arises from or relates to decisions made by the Sinovac Board, including its decision not to honor Prime Success's shares, to deny Prime Success the right to vote, and to withhold scheduled dividend payments from Prime Success.  The Sinovac Audit Committee is actively engaged in remedial efforts in New York, where Sinovac is listed, relating to the resignation of Sinovac's auditor resulting from Sinovac's unlawful attempts to invalidate Prime Success's holdings.

27.    In the alternative, the Court has personal jurisdiction over Sinovac pursuant to the federal long-arm statute, Federal Rule of Civil Procedure 4(k)(2), because Petitioner asserts a federal claim pursuant to 9 U.S.C. § 203, and Sinovac is, if not subject to personal jurisdiction in New York, not subject to personal jurisdiction in any state's courts of general jurisdiction.  Sinovac regularly and systematically conducts business in this District and has property in the jurisdiction,

---

[2] More specifically, Sinovac's NASDAQ-listed shares are issued, tracked, housed, and maintained by DTC, in New York City, which is a clearinghouse that operates as Sinovac's agent and manages Sinovac's shareholder communications.  DTC uses its subsidiary Cede & Co. as its nominee to hold legal title to individual shares.  DTC holds the original jumbo or global certificate for all issued shares and maintains the register of shareholders.  Sinovac has retained Equiniti to serve as its corporate trustee, paying agent, and clearinghouse for dividend payments to Sinovac's registered shareholders.

including in the form of contractual rights to payment by and from its paying agent, Equiniti. Further, Sinovac has purposefully availed itself of the opportunity to do business in the United States generally by registering and listing its shares on the NASDAQ and agreeing to comply with federal securities laws, SEC rules and regulations, and NASDAQ listing rules.  As such, Sinovac has sought to take advantage of the United States' markets, and its unlawful decision to deprive Prime Success of its rights as a shareholder in a public company listed in the United States will have a foreseeable effect within the United States.  In addition, Sinovac has repeatedly initiated litigation in the United States relating to the events described herein.

28.    Alternatively, the Court has *quasi-in-rem* jurisdiction over Sinovac pursuant to 9 U.S.C. §§ 201–208 and CPLR Art. 52 because it maintains property subject to attachment or execution in this District in the form of its shares held by DTC, funds held by, and the right to direct payment by, its paying agent, Equiniti, and any reversionary interests in that property, and the current action seeks to enjoin Sinovac's actions with respect to, and to preserve, such property. Among other things, this action seeks injunctive relief to preserve such property to render it available pursuant to a remedy in an arbitration award, which may be enforced in this District under the Federal Arbitration Act and New York Convention.  *See* 9 U.S.C. § 207; *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 396–98 (2d Cir. 2009) (holding that petitions to "confirm foreign arbitral awards pursuant to the New York Convention" may be premised on *quasi-in-rem* jurisdiction); *see also* CPLR 7502(c) (authorizing injunctions where arbitration awards "may be rendered ineffectual without such provisional relief").  If Sinovac is not enjoined as requested herein, Equiniti may distribute dividends to which Prime Success is entitled to other shareholders, potentially nullifying this Court's *quasi-in-rem* jurisdiction. *See Forbes IP (HK) Ltd. v. Media Bus. Generators, S.A. de C.V.*, 2024 WL 1743109,

at *5 (S.D.N.Y. Apr. 23, 2024) (considering "threat to the issuing court's in rem or quasi in rem jurisdiction" in evaluating claim for antisuit injunction in aid of arbitration under the New York Convention) (citation omitted); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, 2025 WL 1558380, at *15 (S.D.N.Y. June 2, 2025) (similar).

29.    The Court has personal jurisdiction pursuant to New York's general-jurisdiction statute, CPLR 301, over the OrbiMed Respondents because their principal places of business are in New York City, New York.

30.    The Court has personal jurisdiction over Respondent 1Globe pursuant to New York's long-arm statute, CPLR 302, because it has directed and continues to direct the improper and tortious acts of Sinovac's Board of Directors, which have been acting in New York for the benefit, with the knowledge, and under 1Globe's control.  In particular, the OrbiMed directors (who operate out of New York, where OrbiMed is based, and at least one of whom resides in New York) are part of a consortium that is ultimately controlled by 1Globe.  Additionally, 1Globe, acting through the several directors it controls, has directed Sinovac's agents acting within New York, including DTC and Equiniti, to commit unlawful acts directed at Prime Success regarding the rights and property in this District as to which relief is requested.

31.    The Court has personal jurisdiction pursuant to New York's general-jurisdiction statute, CPLR 301, over Relief Respondents DTC and Equiniti because they are New York corporations headquartered in New York City, New York.

32.    The Court has personal jurisdiction pursuant to CPLR 301 over Relief Respondent Cede & Co because it is a New York partnership.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Respondents are subject to the Court's personal jurisdiction and a substantial part of property that is the subject of the requested relief is situated in this District.

## FACTUAL BACKGROUND

34.     Together with other members of their consortium, 1Globe and OrbiMed, who now solely control the board of Sinovac, have engaged in a long-running scheme to extract the value of Sinovac's business for their benefit, to the detriment of other shareholders and Sinovac itself. As part of this scheme, Respondents recently made clear that they do not intend to honor Prime Success's shareholder rights and holdings. And less than two weeks ago, Respondents sought expedited interim relief in Antigua to invalidate Prime Success's investment agreements. This Court's intervention is necessary to maintain the status quo and prevent irreparable harm while the Arbitrations proceed to determine the validity of Prime Success's investments.

### Sinovac

35.     Sinovac is a Chinese biopharmaceutical company that focuses on the research, development, manufacture, and commercialization of vaccines. Sinovac's product portfolio includes vaccines against COVID-19, enterovirus 71 (EV71) infected Hand-Foot-Mouth Disease (HFMD), hepatitis A, hepatitis B, varicella, influenza, poliomyelitis, pneumococcal disease, and mumps. The Company was founded in 2003 by Weidong Yin. Since 2009, Sinovac has been listed on the NASDAQ. While its shares were publicly traded for many years, public trading was halted in 2019 as a result of the events described herein.

36.     In 2016 and 2017, a group of activist shareholders developed a secretive scheme to take control of Sinovac and extract its value for themselves. 1Globe and Chiang Li were the leaders of this scheme, and they began by secretly acquiring a large stake in Sinovac without

making required disclosures under U.S. securities laws, using Li's relatives as undisclosed nominees to purchase Sinovac shares on 1Globe's behalf.  By the end of 2017, 1Globe and Li had secured approximately 31% of Sinovac's outstanding common stock without making disclosures.  As discussed below, the SEC later issued a scathing cease and desist order and imposed monetary penalties on 1Globe and Li for their violations of federal securities laws.  Unable to defend their violations, 1Globe and Li consented to that order.  *See* Ex. 5, *In the Matter of 1Globe Capital, LLC and Jiaqiang "Chiang" Li*, SEC File No. 3-19799.

### The February 2018 Annual Meeting and Contested Director Election

37.    While they were eventually sanctioned by the SEC, 1Globe and Li's violations allowed them to keep their takeover plans secret when it mattered.   On December 29, 2017, Sinovac announced an Annual General Meeting ("AGM") of Shareholders to be held on February 6, 2018, in Beijing.  The "primary agenda of the meeting" included a vote to "approve the re-election" of Sinovac's directors (the "Original Directors").

38.    At the AGM, without any advance notice, 1Globe and OrbiMed ambushed Sinovac and unsuspecting shareholders by moving to amend the ballot to include the option to vote for an alternative slate of directors they proposed—namely, Guowei Wang, Jianzeng Cao, Haifeng Qiu, Pengfei Li, and Dr. Yuk Lam Lo ("Alternative Directors").  Ex. 4, *1Globe Capital, LLC v. Sinovac Biotech Ltd.*, No. ANUHCV 2018/0120, at *6 (E.C.S.C. Dec. 19, 2018).  Because 1Globe had secretly acquired a large percentage of Sinovac's stock and had banded together in an undisclosed consortium, the activist shareholders won the vote.  *Id.* at *10–11; Ex. 5, *In the Matter of 1Globe Capital, LLC and Jiaqiang "Chiang" Li*, SEC File No. 3-19799.

39.    Following the advice of Antiguan counsel after the meeting that the ballot proposed by 1Globe without prior notice at the AGM was invalid, Sinovac announced that the Original Directors had been re-elected.  This led to extensive litigation.

### 1Globe's Antigua Lawsuit in March 2018

40.    In particular, on March 13, 2018, 1Globe filed suit in Antigua to dispute the outcome of the election (the "First Antigua Lawsuit"), seeking a declaration that the activist group's directors were duly elected at the AGM and an order that that "any actions taken on behalf of the Company" by the Original Directors "after the AGM are null and void."  Ex. 3, *1Globe Capital, LLC v. Sinovac Biotech Ltd.*, Claim Form (Mar. 13, 2018); Ex. 4, *1Globe Capital, LLC*, No. ANUHCV 2018/0120.   Sinovac, for its part, commenced lawsuits in Delaware and Massachusetts to challenge 1Globe's actions, and the SEC initiated enforcement proceedings against 1Globe.

41.    The First Antigua Lawsuit went to trial in 2018.  At trial, 1Globe only called one witness—Pengfei Li, who was the head of 1Globe China and an Alternative Director nominee.  Ex. 4 at *24.  He lied under oath, testifying that 1Globe was "neutral" at all times and never part of a consortium (called the "Sinobioway Consortium" after the name of another shareholder) that had executed a written agreement to align their interests in seizing control over Sinovac.  *Id.* at *24–25.  He claimed that the document showing 1Globe's participation was "forged."  *Id.* at *25.  The trial court found Pengfei Li "to be [not] at all credible" and to have lied on all points, concluding that "there was a secret plan to take control of the Company and that [1Globe], through Mr. Li, knew of and acquiesced in this plan."  *Id.* at *27.  1Globe appealed.

**The Consortium's Self-Help Efforts to Gain Control of Sinovac**

42.    The pursuit of litigation was not all 1Globe would do to try to seize control over Sinovac.  Instead, 1Globe and others in its consortium engaged in a sustained pattern of attacks on the Company to try to seize power on their own.

43.    In April 2018, a shareholder called Sinobioway and its founder, Aihua Pan, used a forged company seal of a Sinovac entity (Sinovac Hong Kong) and the forged signature of Weidong Yin (the Company's founder) to steal Sinovac Beijing's business license and various Company seals.  At around the same time, they used force in an attempt to take physical control of a Sinovac facility and seize other Company information, limiting the movements of employees in Sinovac Beijing's offices.  They cut power to Sinovac's facilities, ruining the Company's pharmaceutical products.  Then, in August 2018, Pan held a purported Sinovac Beijing board meeting where he purported to dismiss all directors and replace them with the Alternative Directors.  The resolutions for this purported meeting contained the forged signature of a director. Ex. 22, *Sinovac Sets the Record Straight Regarding False Statements by Shandong Sinobioway Biomedicine Co., Ltd.* (Apr. 18, 2018); Ex. 23, *Sinovac Comments on Unauthorized Use of Falsified Sinovac Hong Kong's Company Seal and Subsidiary Board Member Signatures* (Oct. 9, 2018) ("Oct. 9 Press Release").

44.    Two months later, in October 2018, Sinovac discovered that two of the Alternative Directors proposed by 1Globe and OrbiMed—Pengfei Li and Jianzeng Cao—had forged documents and illegally filed them with the Hong Kong Companies Registry.  Ex. 23, Oct. 9 Press Release; Ex. 24, *Sinovac Granted Interim Injunctive Relief Regarding Filings Bearing a Falsified Company Seal and Forged Board Member Signatures* (Oct. 22, 2018) ("Oct. 22 Press Release"). Those forged, falsified documents were fake letters of resignation from two directors of Sinovac

Hong Kong, Weidong Yin and Nan Wang, along with a forged company seal and forged signatures of both directors. 1Globe and Pengfei Li also used these forged documents in an attempt to deceive the Industry and Commerce Bureau of Beijing into believing that Sinovac Beijing's board had been reconstituted. Ex. 24, Oct. 22 Press Release.

45. These criminal schemes did not work. In November 2018, the Hong Kong High Court granted permanent injunctive relief against Pengfei Li and Jianzeng Cao. Ex. 25, *Hong Kong High Court Issues Declaratory Orders and Permanent Injunctive Relief in Favor of Sinovac's Senior Management* (Nov. 28, 2018). The Industry and Commerce Bureau of Beijing discovered 1Globe's use of forged documents in seeking to reconstitute the Sinovac Beijing board. Ex. 23, Oct. 9 Press Release. A Chinese court imposed a substantial judgment against Sinobioway and Aihua Pan for their misconduct. Ex. 21, *Beijing Fourth Intermediate People's Court Issues Judgement Against Sinobioway Medicine and Mr. Aihua Pan* (Sept. 28, 2020). And, as noted, the Antigua trial court found that Pengfei Li lied under oath in claiming that 1Globe was "neutral" and never had a plan to take over Sinovac. Ex. 4, *1Globe Capital, LLC*, No. ANUHCV 2018/0120, at *27.

### The SEC Imposes Sanctions Against 1Globe and Chiang Li

46. Meanwhile, the SEC opened an investigation into 1Globe and Chiang Li for potential violations of the Securities Exchange Act of 1934 ("Exchange Act") through their undisclosed accumulation of Sinovac common shares and takeover plan leading up to the AGM. In May 2020, the SEC issued a Cease and Desist order against 1Globe and Chiang Li, finding multiple violations of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder by using friends and family to accumulate a controlling position in Sinovac to pursue their takeover without disclosures. Ex. 5, *In the Matter of 1Globe Capital, LLC and Jiaqiang "Chiang" Li*, File

No. 3-19799, at 1, 9–10. The SEC found that, "[b]y the end of 2017, 1Globe Capital, Li, and related parties together held nearly one-third of the common stock of [Sinovac]," and that these parties "participated in an activist plan to replace four of five incumbent directors ... , but failed to disclose ... their full beneficial ownership of Sinovac stock." *Id.* at 2.

47. The SEC then identified the many specific violations that 1Globe and Li committed as part of their takeover plan:

- As of April 2016, 1Globe and Li failed to file a Schedule 13D disclosing their ownership of 20% or more of Sinovac common shares, thereby violating Section 13(d)(1) and Rule 13d-1. *Id*. at 9.

- In 2017 and 2018, 1Globe and Li failed to file amended Schedules 13D disclosing their numerous acquisitions of an additional 1% or more of Sinovac common stock, thereby violating Section 13(d)(2) and Rule 13d-2(a). *Id.*

- In their July 2017 Schedule 13D, 1Globe and Li failed to disclose (i) 1Globe's full ownership of Sinovac common stock, inclusive of ownership of shares held in Li's account as well as the accounts of two of Li's relatives; (ii) 1Globe's plans or proposals regarding additional acquisitions of Sinovac shares; and (iii) 1Globe's arrangements, understandings or relationships with respect to Sinovac securities, even as both of Li's relatives held Sinovac shares in their accounts, the purchase of which had been substantially funded by 1Globe and Li. These failures violated Section 13(d)(1) and Rule 13d-1. *Id*. at 9–10; *see also id.* at 2–3.

- As of July 2017, Li had also failed to file a Schedule 13D disclosing his plans to support the Sinobioway Consortium, thereby violating Section 13(d)(1) and Rule 13d-1. *Id*. at 10; *see also id.* at 7.

- As of January 2018, 1Globe and Li had failed to file a Schedule 13D disclosing their effort to replace four of Sinovac's five incumbent directors through a shareholder vote at the Sinovac annual meeting, thereby violating Section 13(d)(2) and Rule 13d-2. *Id*. at 10.

- In their March 2018 amended Schedule 13D, 1Globe and Li: (i) again failed to disclose 1Globe's ownership of Sinovac common stock shares, inclusive of shared ownership of shares held in Li's account and the accounts of his relatives; (ii) made incomplete disclosure regarding 1Globe's actions in connection with the February 2018 annual shareholder meeting, while omitting material facts concerning 1Globe's and Li's participation in the effort to replace Sinovac's directors; (iii) failed to disclose 1Globe's plans or proposals regarding additional acquisitions of Sinovac shares; and (iii) failed to disclose 1Globe's arrangements, understandings or relationships with respect to Sinovac securities, even as both of Li's relatives held Sinovac shares in their accounts and the purchase of those shares had been substantially funded by 1Globe and Li. The SEC found these actions constituted violations of Section 13(d)(2) and Rule 13d-2. *Id*. at 10.

48.    The SEC ordered 1Globe and Li to cease and desist from committing or causing any violations or future violations Section 13(d)(1) and 13(d)(2) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder, and imposed civil money penalties against 1Globe and Li personally. *Id*. at 11.

49.    1Globe and Li consented to the order in which the SEC found these violations.

50.     About a year later, in 2021, 1Globe lost its appeal of the claims it raised in Antigua and appealed again.  *See* Ex. 6, *1Globe Capital, LLC v. Sinovac Biotech Ltd.*, No. ANUHCVAP2019/0005 (Ct. App. E.C.S.C. Dec. 9, 2021).

### The Consortium's Further Self-Help Efforts to Gain Control of Sinovac

51.     Remarkably, none of this deterred 1Globe or its executives Chiang Li and Pengfei Li.  In May 2022, 1Globe used forged government documents and seals to illegally alter corporate records in an effort to steal a 34% stake of Sinobioway Medicine Co., Ltd. which holds 26.91% of the shares in Sinovac Beijing.  In 2024, Pengfei Li—the head of 1Globe China who was found to have lied under oath in Antigua and was one of the nominated Alternative Directors—was prosecuted and convicted by a Chinese court for this embezzlement and forgery.  He was sentenced to eight years in prison.

### The Securities Purchase Agreement and Prime Success's Investment Sinovac 2018

52.     While all of this was happening, Sinovac was trying to run its business.  This was not easy.  These events cast a pall over Sinovac, and the NASDAQ halted trading in Sinovac's shares in 2019 as a result.

53.     At the end of December 2017 (immediately before the disputed AGM vote), Sinovac had about $22 million available (in terms of cash and equivalents minus current liabilities) to fund its operations.  This was not sufficient to pursue research into new products and make capital improvements.  By June 2018, Sinovac's cash position had worsened—it had only $4 million available for operations (again in terms of cash minus liabilities).  And due to the events discussed above, Sinovac's governance was plagued by uncertainty that made it impossible for Sinovac to secure funding through bank loans.

54.     Accordingly, in April 2018, Sinovac solicited an investment from private investors (through a private investment in public entity ("PIPE") transaction) to fund the development of its facilities—including for vaccine research.  The proposed price for this transaction of $7.35 per share was recommended by Houlihan Lokey, an independent valuation firm.  Prime Success and Vivo agreed to invest.

55.     In July 2018, Prime Success, Vivo, and Sinovac executed a securities purchase agreement (the SPA) under which Prime Success and Vivo each agreed to invest $43.365 million in the Company in exchange for 5,900,000 common shares, with all the rights and privileges of any other shareholder.  Ex. 1, SPA § 2.1.  Sinovac, via its agent DTC, issued share certificates to Prime Success.  As of the filing of this Petition, Prime Success beneficially owns 5,851,423 of those common shares—approximately 8.14% of the outstanding common stock based on Sinovac's Form 20-F filed with the SEC on April 29, 2024.  Vivo also continues to beneficially own its shares.  Vivo negotiated for and obtained a Board seat, while Prime Success, acting as a passive investor, did not.

56.     On behalf of Sinovac, the SPA was executed by the Company's founder and longtime President and CEO, Dr. Weidong Yin, who has been the Company's President and CEO from his founding of the Company in 2003 to the present.  In the SPA Company Disclosure Schedule Section 1.1(A), Dr. Yin is identified as a Company Knowledge Party serving as its Chairman, President, and Chief Executive Officer.   Under the Company's Articles of Incorporation, acts of the President of Sinovac "bind the Corporation as if the said act had been approved by the Board of Directors."  Ex. 7, *Sinovac Articles of Incorporation and Bylaws*.

57.     As noted earlier, the SPA includes a mandatory arbitration provision requiring that "[a]ny dispute, claim, controversy or difference arising out of or in connection with [the SPA] or

the transactions contemplated hereby, including any question regarding its existence, validity, interpretation, performance or termination or any dispute regarding any noncontractual obligation arising out of or in connection with it (a 'Dispute'), shall be determined by arbitration administered by the Hong Kong International Arbitration Centre" in Hong Kong.  Ex. 1, SPA § 6.10(b).  The SPA is governed by Hong Kong law.  "The award may be entered in any Court having competent jurisdiction thereof," which includes this Court.  *Id.*

58.    Prime Success's capital infusion fueled Sinovac's growth, enabling it to develop new products and expand its facilities to meet the growing demand for vaccines.

**The Convertible Loan Agreement and Prime Success's Investment in Sinovac L.S. in 2020**

59.    About 18 months later, COVID hit—creating a global need for vaccine research and production, while simultaneously freezing capital markets and investments.  Prime Success's investment from 2018 left Sinovac with cash on hand, and it used $24 million of that money to launch early research and development into a vaccine for COVID-19—dubbed "CoronaVac"— via the Company's Beijing subsidiary Sinovac L.S.

60.    In early May 2020, CoronaVac had just commenced Phase I clinical trials—an early stage of pharmaceutical development—and Sinovac L.S. was short of money to complete the necessary clinical trials.  Sinovac once again reached out to private investors, including Prime Success and Vivo, to seek an infusion.  While other investors shied away in light of the clinical risks and commercial uncertainty, Prime Success and Vivo once again agreed to invest.

61.    On May 18, 2020, Prime Success entered into a convertible loan agreement (the CLA) with Sinovac L.S. to loan it $7.5 million in necessary capital, with those funds earmarked for CoronaVac research.  Ex. 2, CLA.  In exchange for its investment, Prime Success had the option to convert its loan into a 7.5% equity interest in Sinovac L.S.  This conversion value was

determined based on an analysis of comparable companies with early-stage assets and the relatively low prospect of commercialization of CoronaVac given Sinovac's prior experience with SARS vaccines.  Vivo entered into the same agreement.

62.    The CLA was signed by Dr. Weidong Yin in his capacity as the Executive Director of Sinovac L.S.  Ex. 2, CLA at 16.  Dr. Yin has been a Director of Sinovac L.S. from his founding of that entity in 2009 to the present.  Sinovac L.S. has a separate board from the Board of Sinovac. The Board of Sinovac L.S. has never been subject to challenge and was not part of the disputed shareholder vote in 2018.

63.    Section 11.2 of the CLA contains an arbitration clause which provides that, unless settled by the parties within a 30-day period, "[a]ll disputes arising out of or in connection with" the CLA "shall be settled at the China International Economic and Trade Arbitration Centre" in Beijing.  *Id.* § 11.2.  The CLA is governed by PRC law.

64.    In the CLA, Sinovac L.S. warranted that it had "all requisite power and authority to execute, deliver and perform" the agreement, that there were no claims pending or threatened that "question[] the validity of this Agreement or the right of [Sinovac L.S.] to enter into it," and that the CLA created "valid and legally binding obligations of" Sinovac L.S.  *Id.* § 8.1.

65.    Sinovac and Prime Success also entered into a Guarantee Agreement (the GA) relating to Sinovac L.S.'s obligations under the CLA.  It contains the same arbitration provision.

66.    Pursuant to Article 39 of Sinovac L.S.'s Amended and Restated Articles of Association, Prime Success's capital contribution to Sinovac L.S. entitles it to dividends in proportion to Prime Success's equity interests in Sinovac L.S.

67.    In December 2020, CoronaVac was approved for emergency use and in Phase III clinical trials.  At that point, Prime Success and Sinovac L.S. entered into a Debt-To-Equity

Conversion Agreement (the DECA) to convert Prime Success's interest into equity. That agreement also contains the same arbitration provision.

68.     Ultimately, CoronaVac became highly successful. By the end of 2021, Sinovac had supplied 2.5 billion doses of CoronaVac worldwide, becoming the most widely used COVID-19 vaccine in the world. This led to extraordinary profits. While Sinovac posted just $204 million in gross profits in 2018, it posted $18.3 billion in gross profits in 2021.

### The Privy Council Decision and New Board's Self-Dealing

69.     On January 16, 2025, the final appellate court of the Antigua court system—the Privy Council in London—ruled that 1Globe and OrbiMed were entitled, under Antiguan law, to ambush the Company at the AGM in 2018, meaning that the Alternative Directors had been duly elected as of February 2018. Ex. 8, *1Globe Capital LLC v. Sinovac Biotech Ltd.*, No. JCPC/2022/0041 ¶ 87 (Jan. 16, 2025). By the time of that ruling, 1Globe had abandoned its original claim in Antigua that actions taken by the Original Directors after the AGM should be deemed "null and void." 1Globe did not pursue that issue after its trial loss and then expressly abandoned any appeal on that issue at the hearing—informing the Privy Council that "the relief below that was sought also included a declaration as to the validity of the acts of the directors in the intervening period, but I think that's too complex of a matter at this stage of the day[.]" Video of 11 July 2024 Afternoon Session, *1Globe Capital LLC v. Sinovac Biotech Ltd.*, No. JCPC/2022/0041 at 2:05:15-2:05:48 (2025), *available at* https://jcpc.uk/cases/jcpc-2022-0041#watch-hearings.

70.     In the aftermath of this ruling, on February 28, 2025, Sinovac announced that a "New Board" had been installed. Ex. 9, *SINOVAC Announces New Board Pursuant to Privy Council Judgment and Order* (Feb. 28, 2025). The members of this "New Board" were (i) Dr.

Chiang Li, the principal of 1Globe, who was not on the 2018 slate, (ii) Pengfei Li, the head of 1Globe China who is currently detained in China, (iii) David Guowei Wang, a partner of OrbiMed, (iv) Jianzeng Cao, who was involved in the criminal acts discussed above, and (v) Dr. Yuk Lam Lo, the sole director not controlled by 1Globe and OrbiMed.  *Id.*  The announcement gave no explanation for the changes in the Board relative to the Alternative Directors who had been proposed in 2018.  *See id.*  Nor did it address the removal of Vivo's designee to the Board.  *See id.*

71.    On March 28, 2025, Sinovac announced that Sven Borho, a founder of OrbiMed, had been appointed to fill "a vacancy created by a recent resignation."  Ex. 10, *SINOVAC Announces New Board Member and Chairman of the Audit Committee* (Mar. 28, 2025).  The resignation appears to be of Jianzeng Cao.  With the addition of Borho to the board, OrbiMed—a less than 4% shareholder of Sinovac—now holds two of the five board seats, with 1Globe holding two more, giving 1Globe and OrbiMed plenary power over the Company.[3]

72.    This arbitrary vesting of sole power in two shareholders (one of which owns only a small percentage of the Company's shares) has not sat well with other shareholders. Accordingly, on March 18, 2025, one major shareholder—SAIF Partners IV L.P. ("SAIF")— submitted a requisition for an extraordinary shareholder meeting to remove and replace the New Board with a larger Board that would represent all constituents.  Ex. 11, *SAIF Notice of Requisition of Special Shareholders' Meeting* (Mar. 18, 2025).  Sinovac did not respond, so on April 16, 2025, SAIF reiterated its demand, this time through Relief Respondents DTC and Cede & Co.  Ex. 12, *Letter from Morgan Stanley to DTC* (Apr. 16, 2025).  On May 19, 2025, the New Board scheduled

---

[3] Pengfei Li initially served as a director from a detention center, but on May 19, 2025, he resigned.  Thus, as of today, 1Globe and OrbiMed control three of the Company's four directors.

this shareholder meeting for July 8, 2025.  Ex. 13, *Sinovac Biotech Ltd. Notice of Special Meeting of Shareholders* (May 19, 2025).

73.    On April 1, 2025, the New Board announced a dividend in the amount of $55 per share that it planned to issue, specifying that it intends to issue more dividends in the future and "intends for SINOVAC shareholders to receive pro-rata distributions in due course."  Ex. 14, *SINOVAC Announces Decision to Declare Cash Dividend* (Apr. 1, 2025).  But the New Board also said it was "assessing certain corporate actions taken by the former board of directors of the Company," suggesting that it may not honor the investments by Prime Success and Vivo in 2018. *Id.*

74.    On April 15, 2025, Sinovac's auditor, Grant Thornton Zhitong Certified Public Accountants LLP ("Grant Thornton Zhitong"), resigned as a result of the Company's announcement on April 1, 2025, which it found created uncertainty as to the validity of resolutions adopted by the prior board members as well as management representations on which Grant Thornton Zhitong relied.  In other words, the New Board's statement that it may disregard Prime Success's investment from 2018 called into question seven years of the Company's management and operations and three years of financial statements—forcing the auditor to resign.

75.    The resignation of Grant Thornton Zhitong caused Sinovac to miss the SEC-imposed deadline to file Sinovac's FY 2024 Annual Report on Form 20-F, which was due on April 30, 2025.  On April 29, 2025, Sinovac filed a Form 12b-25 stating that it could not file its Annual Report by the due date, citing the resignation of Grant Thornton Zhitong.

76.    On May 23, 2025, Sinovac announced that it had received notice that it was delinquent with respect to NASDAQ Listing Rule 5250(c)(1) due to its failure to file its FY 2024

Annual Report.  If Sinovac is unable to regain compliance by July 15, 2025, it may be delisted from the NASDAQ.

## The HKIAC Arbitration

77.    On March 17, 2025, Vivo filed a Notice of Arbitration in the HKIAC ("the HK Arbitration") to confirm the validity of its investment from 2018.  Vivo seeks declaratory relief that the SPA remains in full force and effect, that the SPA cannot be terminated, and that the Company is precluded from seeking to relitigate the matter of whether the actions of the Board were "null and void"—an issue on which 1Globe lost in the courts of Antigua and did not appeal.

78.    On March 26, 2025, Prime Success wrote to Sinovac, seeking confirmation that the New Board would not take any action to prejudice or interfere with Prime Success's shareholdings. Prime Success did not receive a response, so it followed up on April 5, 2025.  Sinovac refused to so agree.  In particular, Sinovac has refused to agree to pay Prime Success its pro-rata share of the upcoming dividends or even to escrow those funds.  Ex. 26, May 14, 2025 Correspondence. Consequently, on April 9, 2025, Prime Success requested to join the HK Arbitration as a claimant, which was approved by the HKIAC on May 7, 2025.

79.    On April 28, 2025, Sinovac filed its Answer in the HK Arbitration, disclaiming the SPA.

## Respondents' Antigua Lawsuit

80.    One week later, on May 6, 2025, Sinovac, OrbiMed, and 1Globe banded together to file a lawsuit in Antigua seeking to invalidate Prime Success's and Vivo's purchase of common stock of Sinovac and thereby circumvent the HK Arbitration (the "Second Antigua Lawsuit"). Ex. 15, Statement of Claim, No. ANUHCV2025/0200.  Among other requests, they seek a declaration that the SPA and related agreements are, and always have been, invalid and/or void,

that the issuance of Prime Success's and Vivo's shares "should be set aside," and that Prime Success and Vivo should be deleted from the register of shareholders.

81.    In a bizarre turn, Respondents are also asking the Antigua court to invalidate the CLA between *Sinovac L.S.* and Prime Success—a contract to which Respondents are not parties. Respondents claim that the grant of equity in Sinovac L.S. to Prime Success and Vivo was unauthorized even though the CLA was signed by the Executive Director of Sinovac L.S. and approved by the Board of Sinovac L.S.—a Board that was never challenged, never the subject of an election dispute, and never addressed by the Privy Council.  Even months after the 1Globe and OrbiMed took control of Sinovac (the parent entity), they have made no changes to the Board of Sinovac L.S. (the subsidiary) that approved Prime Success's and Vivo's investments.

82.    This reveals the true purpose of Respondents' claims in Antigua:  to entrench 1Globe's and OrbiMed's controlling positions and enrich themselves.  By trying to deprive Prime Success and Vivo of the right to vote at the upcoming shareholder meeting, 1Globe and OrbiMed hope to solidify their plenary power over the Company.  And by refusing to pay Prime Success and Vivo the dividends paid to all other shareholders, 1Globe and OrbiMed hope to seize the value that Prime Success and Vivo helped to create—while 1Globe and OrbiMed attacked the Company—for themselves.

83.    Indeed, the scope of the relief Respondents seek in the Second Antigua Lawsuit is telling as to their goals.  Respondents are not asking the court in Antigua to invalidate *all* of the actions taken by Sinovac and its Original Directors over the past seven years since the AGM took place in 2018.  If they did, they would be repudiating the tremendously successful operational decisions, management, and contracts that yielded worldwide domination of the COVID vaccine market and revenues of more than $18 billion.  Instead, Respondents are *only* attacking the

investments made by Prime Success and Vivo. And even there, they do not seek to invalidate the entire SPA, or *all* of the shares issued pursuant to the SPA. Rather, they *only* challenge the shares that are *still* held by Prime Success and Vivo—because they know that Prime Success and Vivo will vote them out of office. This is not an attempt to effectuate the Privy Council's ruling about what should have happened back in 2018. It is an attempt to entrench 1Globe's and OrbiMed's power and enrich their principals at Prime Success's and Vivo's expense.[4]

84.    Less than two weeks ago, on May 30, 2025, Respondents filed an application for interim relief in an effort to rush to judgment in Antigua and thereby circumvent and potentially moot the HK Arbitration. Ex. 16, Notice of Application; Ex. 17, Dacosta Aff. While admitting that Prime Success and Vivo are current beneficial owners of shares on the Company register, Respondents have asked the Antiguan court to restrict the rights of Prime Success and Vivo in three ways: (1) by denying them the right to vote at the shareholders' meeting scheduled for July 8, 2025; (2) by denying them the ability to count for the purpose of a quorum at that meeting; and (3) by denying them dividends that will be paid to all other shareholders. In other words, Respondents are asking the Antiguan court to *immediately and irrevocably alter the status quo rights* of long-term shareholders by precipitously addressing claims that have been pending in the HK Arbitration—the forum required by contract—for months.[5]

---

[4] In December 2020, a firm called Chia Tai also invested in Sinovac L.S. Respondents have not sought to void that investment.

[5] In light of Respondents' challenge to the validity of the investment agreements between Prime Success and Sinovac L.S., Prime Success provided notice of its intent to initiate an arbitration in the PRC on June 9, 2025. The arbitration provision requires 30 days of negotiations before a party may file a claim for arbitration. Prime Success intends to commence the arbitration once it can.

## Prime Success's Rights as an Owner of Sinovac Stock

85.     Respondents have no right to do any of this.  To the contrary, Prime Success has clear, indisputable rights as a major Sinovac shareholder.  As of today, Sinovac's share registry shows that Prime Success has beneficial ownership of 5,851,423 common shares of Sinovac. Prime Success's ownership of those shares gives it rights.  Respondents can challenge the grant of shares to Prime Success in the Arbitrations, but unless and until Prime Success's investments are voided by the arbitrators—which will not happen because there are no grounds for voiding those arm's length investments—Respondents cannot simply disregard Prime Success's rights.

86.     In particular, Prime Success's undisputed status as a shareholder ***gives it the right to vote*** at the upcoming shareholder meeting.  Antigua's International Business Corporations Act ("IBCA") provides, in section 28, that "[w]hen a corporation has only one class of shares the rights of the holders are equal in all respects and include - (a) the right to vote at any meeting of shareholders."  Section 105(2) provides:  "For the purpose of determining shareholders who are entitled to receive notice of a meeting of shareholders of the corporation, the directors of the corporation may fix in advance a date as the record date for the determination of shareholders." Section 111(1) specifies that a corporation must "prepare a list of its shareholders who are entitled to receive notice of a meeting, arranged in alphabetical order and showing the number of shares held by each shareholder," not later than "ten days after the record date is fixed."  And under section 111(2), "a person named in the list is ... entitled, at the meeting to which the list relates, to vote the shares shown opposite his name."

87.     As noted, on May 19, 2025, Sinovac announced a Special Meeting of the Shareholders of Sinovac to be held on July 8, 2025, pursuant to a requisition notice by a major shareholder.  The purpose of the meeting is to elect a new board.  The notice set a record date of

May 19, 2025, on which date Prime Success was (and still is) a major owner of shares on the register. Nevertheless, the New Board announced that it would not permit Prime Success to "receive notice of, or vote at, the Special Meeting." *See* Ex. 13, *Sinovac Biotech Ltd. Notice of Special Meeting of Shareholders* (May 19, 2025). This is a flagrant violation of Prime Success's shareholder rights.

88.     Prime Success's undisputed status as a shareholder also gives it the **right to dividends** when paid to other shareholders. IBCA Section 28 provides that "[w]hen a corporation has only one class of shares the rights of the holders are equal in all respects and include ... (b) the right to receive any dividend declared by the corporation." And Section 105 provides that, "For the purpose of – (a) determining the shareholders of the corporation who are – (i) entitled to receive payment of a dividend; ... the directors may fix in advance a date as the record date for the determination of shareholders; but that record date must not precede by more than fifty days the particular action to be taken."

89.     On April 1, 2025, Sinovac announced that a special dividend of US$55.00 per common share would be paid. Ex. 14, *SINOVAC Announces Decision to Declare Cash Dividend* (Apr. 1, 2025). But Respondents have stated that they will not pay any dividend to Prime Success, and they would not even agree to hold Prime Success's portion of the dividends in escrow. Ex. 26, May 14, 2025 Correspondence. Just the opposite, on April 29, 2025, Sinovac issued a letter to shareholders claiming that the Company expects that the Antiguan litigation will "conclude with the cancellation of the PIPE shares, at which point SINOVAC shareholders would be entitled to receive an additional US$11.00 per common share special cash dividend." Ex. 18, *SINOVAC Board Issues Letter to Shareholders to Set the Record Straight on the Hostile Actions and False Claims by Vivo Capital* (Apr. 29, 2025).

90.     On April 30, 2025, Sinovac announced that it plans to pay the dividends on or about July 9, 2025, as of the record date of May 23, 2025.  Ex. 19, *SINOVAC Announces Record and Distribution Dates for Special Cash Dividend* (Apr. 30, 2025).  As of that date and today, Prime Success was and is a major owner of registered shares entitled to its pro rata portion of dividends.

## **Petitioner Will Suffer Irreparable Harm Absent Prompt Relief**

91.     Absent prompt relief by this Court, Respondents will cause irreparable harm within a matter of days or weeks.  If Sinovac were to preclude Prime Success from voting in the upcoming election scheduled for July 8, 2025, it would further entrench the control of 1Globe and OrbiMed over the Company, including its governance, its operations, and its assets.  If Sinovac were to engage in self-help by distributing billions of dollars of dividends to other shareholders, including hundreds of millions of dollars of dividends owed to Prime Success, that would dissipate its assets and potentially render them unrecoverable.  And if Respondents were to bypass the mandatory arbitral forum for resolving disputes about the validity of Prime Success's investments, that too would constitute a well-recognized form of irreparable harm.

92.     In short, Petitioner will be irreparably harmed if Sinovac were allowed to invalidate, cancel, set aside, or delete Prime Success's shares, or deprive Prime Success of its corresponding right to vote and receive dividends, or pursue such relief in Antigua, when the ultimate validity of the SPA must be determined in the HK Arbitration.  In the SPA, the parties expressly agreed to authorize each other to seek "an injunction or injunctions to prevent breaches of this Agreement and to specific performance of the terms hereof."  Ex. 1, SPA § 6.12.  The issuance of a status quo and anti-suit injunction is warranted.

## CLAIM FOR RELIEF
**(Temporary Restraining Order and Preliminary Injunction in Aid of Arbitration)**

93.     Prime Success repeats and realleges each of the preceding paragraphs of the Petition as if fully set forth herein.

94.     Pursuant to 9 U.S.C. § 206 and Rule 65 of the Federal Rules of Civil Procedure ("FRCP"), this Court may issue injunctions in aid of arbitration.  Likewise, CPLR 7502(c), which the Court may invoke pursuant to Rule 64 of the FRCP, also provides authority to issue "a preliminary injunction in connection with an arbitrable controversy ... upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."

95.     An injunction is warranted here, pursuant to 9 U.S.C. § 206, Rules 64 and 65 of the FRCP, and CPLR 7502(c), to maintain the status quo, prevent further irreparable injury to Prime Success, and ensure that a final award in the Arbitrations is not rendered ineffectual.

96.     Prime Success has a strong likelihood of success on the merits of the parties' dispute.  As described above, Prime Success has indisputable rights as a shareholder of Sinovac which cannot be ignored at the whim of the current Board.  Moreover, the SPA was executed by Dr. Yin, as President and CEO, on behalf of Sinovac, and he had the authority, both actual and apparent, to bind the Company when he executed the SPA.  Prime Success paid tens of millions of dollars for its shares of Sinovac—money that Sinovac used to achieve unprecedented success. As a shareholder equal to all other common stock shareholders, Prime Success is entitled to notice, participation, and voting on its shares at shareholder meetings, and pro rata dividends.  Prime Success remains on the register of Sinovac, which requires the Company to treat Prime Success like all other stockholders.  By engaging in self-help and announcing that Prime Success's shares

will be "set aside," without an HKIAC arbitration award authorizing such action, Respondent Sinovac is taking steps to avoid the arbitration and render any arbitration award ineffectual.

97.    Petitioner face a substantial likelihood of irreparable harm if injunctive relief does not issue, as described herein.  Moreover, the parties acknowledged that any breach of the SPA would cause irreparable harm for which no remedy at law exists.  The parties should be held to that acknowledgment and the arbitral process set forth to address it in the SPA.

98.    The balance of equities tips decidedly in Prime Success's favor because Respondents will suffer no harm if the requested relief is granted.  Prime Success is only asking the Court to maintain the status quo until the arbitral tribunals can resolve the parties' dispute over the validity of Prime Success's investments.  The status quo is that Prime Success is a major shareholder of both Sinovac and Sinovac L.S.—as it has been for seven and five years, respectively.  Maintaining the status quo pending a final ruling by the appropriate adjudicatory body will not cause Respondents any cognizable harm.

99.    Finally, injunctive relief here would serve the public interest.  There is a recognized public policy in favor of enforcing contractual arrangements.

100.    Accordingly, the Court should grant the provisional relief requested herein, issuing:

    a.    A status quo order, pending final resolution and confirmation of the HK Arbitration, prohibiting Respondents and Relief Respondents from taking any further action that would adversely affect Prime Success's rights and status as a Sinovac shareholder or to deprive Prime Success of those rights; and

    b.    An anti-suit injunction prohibiting Respondents from pursuing the Antigua action against Prime Success that threatens to undermine the Arbitrations.

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Dated: New York, New York            By:    /s/ K. McKenzie Anderson
        June 12, 2025                        K. McKenzie Anderson
                                             Michael Swartz
                                             Rachel E. Epstein
                                             Morgan L. Anastasio (admission pending)
                                             295 5th Avenue
                                             New York, New York 10016-7103
                                             Tel.: (212) 849-7000
                                             mckenzieanderson@quinnemanuel.com
                                             michaelswartz@quinnemanuel.com
                                             rachelepstein@quinnemanuel.com
                                             morgananastasio@quinnemanuel.com

                                             B. Dylan Proctor (*pro hac vice* forthcoming)
                                             Zach Meeker (*pro hac vice* forthcoming)
                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
                                             865 S. Figueroa St., 10th Floor
                                             Los Angeles, California 90017
                                             Tel.: (213) 443-3000
                                             dylanproctor@quinnemanuel.com
                                             zachmeeker@quinnemanuel.com

                                             Sarah Heaton Concannon
                                             Gregg Badichek
                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
                                             1300 I Street NW
                                             Suite 900
                                             Washington, D.C. 20005
                                             Tel.: (202) 538-8000
                                             sarahconcannon@quinnemanuel.com
                                             greggbadichek@quinnemanuel.com

                                             *Attorneys for Petitioner Prime Success, L.P.*

## VERIFICATION OF PETITION

Pursuant to 28 U.S.C. § 1746, **YAN YANG** declares as follows:

I am a director of Prime Success's General Partner, Green Vision Partners Ltd. I have read the foregoing Petition for an Injunction in Aid of Arbitration and Memorandum of Law in Support of a Temporary Restraining Order and Preliminary Injunction, and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of June, 2025, at Riverside, Fairfield County, CT, United States.



**YAN YANG**