**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| Prime Success, L.P.,<br><br>     Petitioner,<br><br>   -against-<br><br>Sinovac Biotech Ltd., 1Globe Capital LLC, OrbiMed Advisors LLC, OrbiMed Capital LLC, OrbiMed Partners Master Fund Ltd.,<br><br>     Respondents,<br><br>   -and-<br><br>Equiniti Trust Company LLC, Cede & Co., and the Depository Trust Company,<br><br>     Relief Respondents. | Case No.: _____ |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER PRIME SUCCESS L.P.'S**
**PETITION FOR EMERGENCY INJUNCTIVE RELIEF IN AID OF ARBITRATION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 8

   I.    THIS COURT HAS SUBJECT MATTER JURISDICTION................................. 9

   II.   PRIME SUCCESS IS ENTITLED TO EMERGENCY INJUNCTIVE RELIEF ........... 10

      A.   Prime Success Is Likely To Succeed On The Merits And, At A Minimum, Raises Serious Questions On The Merits. ......................................................................... 11

      B.   Prime Success Will Suffer Irreparable Harm Absent Injunctive Relief ..................... 16

      C.   The Balance Of Hardships Tips Decidedly In Prime Success's Favor........................ 19

      D.   An Injunction Furthers The Public Interest ................................................................. 20

      E.   Prime Success Easily Satisfies Additional Factors for Anti-Suit Injunction............... 20

      F.   No Bond Should Be Required........................................................................................ 24

   III.   THIS COURT HAS PERSONAL JURISDICTION OVER RESPONDENTS ........... 24

CONCLUSION.................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*,
    876 F. Supp. 482 (S.D.N.Y. 1994)...........................................................................11

*Bank Leumi USA v. Ehrlich*,
    2015 WL 12591663 (S.D.N.Y. Sept. 23, 2015)................................................21, 22

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d. Cir. 2015)...........................................................................10, 19

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    910 F.2d 1049 (2d. Cir. 1990)...........................................................................9, 14

*Borden, Inc. v. Meiji Milk Prods. Co., Ltd.*,
    919 F.2d 822 (2d Cir. 1990)....................................................................................9

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999)...................................................................................17

*Charles Schwab Corp. v. Bank of Am.*,
    883 F.3d 68 (2d Cir. 2018)...............................................................................25, 26

*China Trade & Development Corp.*,
    837 F.2d 33 (2d Cir. 1987)....................................................................................22

*Citigroup Glob. Mkts. v. VCG Special Opportunities Master Fund, Ltd.*,
    598 F.3d 30 (2d. Cir. 2010)..............................................................................10, 16

*City of Almaty v. Ablyazov*,
    278 F. Supp. 3d 776 (S.D.N.Y. 2017)....................................................................27

*Clark v. Pattern Analysis & Recognition Corp.*,
    87 Misc.2d 385 (N.Y. Sup. Ct. 1976) ...................................................................18

*Credit Suisse Sec. (USA) LLC v. Ebling*,
    2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006) .......................................................17

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014).........................................................................................25

*Denihan v. Denihan*,
    119 A.D.2d 114 (1st Dep't 1986) ..........................................................................15

*Deutsche Mexico Holdings S.a.r.l. v. Accendo Banco, S.A.*,
   2019 WL 5257995 (S.D.N.Y. Oct. 17, 2019) ........................................................22

*Espiritu Santo Holdings, LP v. L1bero Partners, LP*,
   2019 WL 2240204 (S.D.N.Y. May 14, 2019) .......................................................21

*Forbes IP (HK) Ltd. v. Media Bus. Generators, S.A. de C.V.*,
   2024 WL 1743109 (S.D.N.Y. Apr. 23, 2024)....................................10, 11, 20, 21, 22, 23, 24

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
   582 F.3d 393 (2d Cir. 2009).............................................................................24

*Ge Dandong v. Pinnacle Performance Ltd.*,
   966 F. Supp. 2d 374 (S.D.N.Y. 2013)................................................................25

*Genius Grp. v. LZG Int'l, Inc.*,
   2025 WL 815346 (S.D.N.Y. Mar. 13, 2025) ......................................................17

*Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*,
   246 F.3d 219 (2d Cir. 2001)...............................................................................11

*Helio Logistics, Inc. v. Mehta*,
   2023 WL 1517687 (S.D.N.Y. Feb. 3, 2023) ......................................................10

*Ibeto Petrochemical Indus. v. M/T Beffen*,
   475 F.3d 56 (2d Cir. 2007)................................................................................22

*Int'l Bus. Machs. Corp. v. De Freitas Lima*,
   2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020).....................................................24

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
   500 F.3d 111 (2d Cir. 2007)..........................................................................22, 23

*Kossoff v. Samsung Co. Ltd.*,
   474 N.Y.S.2d 180 (1984)...................................................................................25

*Krauth v. Exec. Telecard, Ltd.*,
   890 F. Supp. 269 (S.D.N.Y. 1995).....................................................................18

*Lapina v. Men Women N.Y. Model Mgmt. Inc.*,
   86 F. Supp. 3d 277 (S.D.N.Y. 2015)..................................................................13

*Lichtenberg v. Besicorp Grp.*,
   43 F. Supp. 2d 376 (S.D.N.Y. 1999)..................................................................18

*Mobile Real Est., LLC v. NewPoint Media Grp., LLC*,
   460 F. Supp. 3d 457 (S.D.N.Y. 2020)................................................................13

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,*
    883 F.3d 32 (2d Cir. 2018)................................................................14

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) ........................................................14

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.,*
    369 F.3d 645 (2d Cir. 2004)...............................................10, 20, 21, 22, 23

*R Squared Glob. v. Serendipity 3, Inc.,*
    2011 WL 5244691 (S.D.N.Y. Nov. 3, 2011) ...........................16, 19, 20

*Res. Grp. Int'l v. Chishti,*
    2024 WL 4135304 (S.D.N.Y. Sept. 10, 2024)................................24

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.,*
    754 F. Supp. 2d 616 (S.D.N.Y. 2010) .....................................10, 19, 20

*Rogers, Burgun, Shahine & Deschler, Inc. v. Dongsan Constr. Co.,*
    598 F. Supp. 754 (S.D.N.Y. 1984)......................................................9

*SG Cowen Sec. Corp. v. Messih,*
    224 F.3d 79 (2d Cir. 2000)...............................................................11

*Shaw Grp. Inc. v. Triplefine Int'l Corp.,*
    322 F.3d 115 (2d Cir. 2003)............................................................12

*Storm LLC v. Telenor Mobile Comm'ns AS,*
    2006 WL 3735657 (S.D.N.Y. Dec. 15, 2006) ..............................17

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.,*
    2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) ........................14, 18

*In re Sumitomo Copper Litig.,*
    120 F. Supp. 2d 328 (S.D.N.Y. 2000)...........................................27

*Telenor Mobile Commc'ns AS v. Storm LLC,*
    584 F.3d 396 (2d Cir. 2009)......................................................20, 23

*Thales Avionics, Inc. v. L3 Techs., Inc.,*
    719 F. Supp. 3d 337 (S.D.N.Y. 2024).............................10, 14, 16, 20

*Unilever Acquisition Corp v. Richardson-Vicks, Inc.,*
    618 F. Supp. 407 (S.D.N.Y. 1985)................................................18

*Venconsul N.V. v. Tim Int'l N.V.,*
    2003 WL 21804833 (S.D.N.Y. Aug. 6, 2003) ...............................9

*Wiwa v. Royal Dutch Petroleum Co.*,
    226 F.3d 88 (2d Cir. 2000) .................................................................................26

*WPIX, Inc. v. IVI, Inc.*,
    691 F.3d 275 (2d Cir. 2012) ...............................................................................17

### **Statutes and Rules**

28 U.S.C. § 1651 ...........................................................................................................24

9 U.S.C. § 201 *et seq.* ..............................................................................1, 9, 11, 23, 24

9 U.S.C. § 203 ..........................................................................................................9, 26

9 U.S.C. § 207 ...............................................................................................................23

CPLR 301 .......................................................................................................................25

CPLR 302(a) ..................................................................................................................25

CPLR 7501 .....................................................................................................................14

CPLR 7502(c) ................................................................................................................11

Fed. R. Civ. Pro. 4(k)(2) ...............................................................................................26

Fed. R. Civ. Pro. 64 ..................................................................................................1, 11

Fed. R. Civ. Pro. 65 ..................................................................................................1, 11

HKIAC 2024 Arb. R. 19.1 ......................................................................................12, 13

IBCA § 105(2) .................................................................................................................5

IBCA § 111 ......................................................................................................................5

IBCA § 28 ........................................................................................................................5

Petitioner Prime Success, L.P. ("Prime Success" or "Petitioner"), respectfully submits this memorandum of law in support of its Petition for Emergency Injunctive Relief in Aid of Arbitration pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards as implemented at 9 U.S.C. § 201 *et seq.*, and Rule 7502(c) of the New York Civil Practice Law and Rules ("CPLR") (the "Petition" or "Pet.") against Respondents Sinovac Biotech, Ltd. ("Sinovac" or the "Company"), 1Globe Capital LLC ("1Globe"), OrbiMed Advisors LLC, OrbiMed Capital LLC, and OrbiMed Partners Master Fund Ltd. (together "OrbiMed," and with Sinovac and 1Globe, "Respondents"), and Relief Respondents Equiniti Trust Company LLC ("Equiniti"), Cede & Co., and the Depository Trust Company ("DTC," and with Equiniti and Cede & Co., the "Relief Respondents").

## **INTRODUCTION**

This Court is vested with explicit authority, under both federal and New York law, to enter appropriate orders to maintain the status quo pending the resolution of foreign arbitrations. The Court should exercise such authority here. Respondents 1Globe and OrbiMed recently gained control over Sinovac, a public company listed on the NASDAQ, and are now forcing it to do their bidding, seeking to (i) entrench their power by disenfranchising long-term shareholders and (ii) take for themselves hundreds of millions of dollars in dividends to which Petitioner is entitled. Respondents have justified these measures on the ground that Petitioner's investment agreement with Sinovac supposedly is invalid because it was approved by the wrong Board. But the validity of that contract is the subject of an arbitration that has been pending in the Hong Kong International Arbitration Centre ("HKIAC") for months. Respondents are trying to circumvent that arbitration. This Court should not allow them to do so.

The history of this dispute is long and complex, involving a hostile takeover by 1Globe and OrbiMed based on SEC violations and criminal misconduct, but the essential facts bearing on

this Petition are simple and irrefutable. Prime Success has been a shareholder of Sinovac for seven years. In 2018, Prime Success and a similarly-situated investor called Vivo Capital, LLC ("Vivo"), invested nearly $100 million in Sinovac, in an arm's length transaction, with the share price set by Houlihan Lokey, to help build the Company's future. Sinovac used that money and a subsequent investment by Prime Success and Vivo in a subsidiary to develop the leading COVID-19 vaccine in the world. This led to astounding success for Sinovac; its revenues increased from about $200 million at the time of Prime Success's initial investment in 2018 to nearly $20 billion in 2021. Sinovac is currently scheduled to dividend out a portion of its profits to shareholders on or about July 9, 2025.

In a prior action in Antigua challenging control over Sinovac's Board of Directors, Respondent 1Globe sought a ruling that Prime Success's investment was "null and void" because it was not properly approved—and **lost** on that issue. At the time, Sinovac successfully defended its investment agreement with Prime Success, which Sinovac's CEO and President had solicited and approved, and which provided funding that Sinovac desperately needed. But 1Globe recently obtained control over Sinovac's Board and has forced the Company to change its position, now claiming that its agreement with Prime Success was never valid. Based on this about-face, Sinovac has stated that it will exclude Prime Success from the upcoming dividend payments, apparently with the intention of giving Prime Success's share of the dividends (over $300 million) to other shareholders—including 1Globe and OrbiMed. And, based on the same change in position, Sinovac's new Board has stated that it will not permit Prime Success to vote at an upcoming shareholder meeting scheduled for July 8, 2025—hoping to entrench 1Globe's and OrbiMed's plenary power over the Company.

Respondents are welcome to challenge Prime Success's investment agreement with Sinovac in the pending HKIAC Arbitration—as they currently are. But they cannot disregard that agreement or the shares and rights that Prime Success obtained under it. Prime Success is a long-term shareholder that made a substantial investment in Sinovac. It holds shares that are reflected on the Company registry, entitling it to the same rights as any other shareholder. The pending HKIAC Arbitration will determine whether Prime Success's investment agreement was valid, but unless and until the arbitrators deem it invalid, Sinovac cannot deprive Prime Success of its rights. Otherwise, by the time the arbitration in Hong Kong is completed, 1Globe and OrbiMed will have successfully but unlawfully entrenched their power at the upcoming shareholder vote and seized for themselves all the value Prime Success created for Sinovac. This Court should prohibit such conduct to ensure that the status quo is maintained.

The Court should also enjoin Respondents from challenging the validity of Prime Success's investment agreement in the wrong forum—the courts of Antigua. In response to Petitioner's arbitration in Hong Kong, Respondents sued Prime Success in Antigua to void its investments. And ten days ago, Respondents served an application for interim relief seeking to *immediately* deprive Prime Success of its shareholder rights. This too is improper. The parties' dispute over the validity of Prime Success's investment contract is arbitrable, and Respondents cannot circumvent the mandatory arbitration agreement by seeking expedited relief in the wrong forum. Their request to do so gives this Court ample grounds to issue an anti-suit injunction, which is necessary to maintain the status quo and complete the arbitration.

For these reasons, Prime Success respectfully requests that the Court grant injunctive relief in aid of the pending arbitration. Petitioner notes that this request is urgent, for Respondents are moving quickly to circumvent that arbitration. In particular, in the past few weeks, Respondents

have: (i) stated that they will not allow Prime Success to vote at the meeting scheduled for July 8, 2025; (ii) stated that they will not pay dividends to Prime Success on the scheduled payment date of July 9, 2025; and (iii) asked the Antiguan court for an expedited hearing, which could take place as soon as June 20, 2025, to approve their plan to deprive Prime Success of its shareholder rights based on their claim that its investment agreement is void. Given the proximity of these upcoming events, Petitioner respectfully seeks both temporary and preliminary relief.

## BACKGROUND

Over the course of more than seven years, a band of hostile activists has engaged in a campaign of extraordinary corporate and criminal malfeasance—including fraud, forgery, and physical attacks on Sinovac's facilities, as well as violations of U.S. securities laws—to seize control over Sinovac. Pet. ¶ 2. Those efforts culminated in a successful corporate takeover in February 2025. *Id.* ¶ 70. Now, in recent weeks, the activists have begun executing the next stage of their plan: retaliating against those who stood in their way, including Prime Success, by forcing Sinovac to change the long-term positions on which it prevailed in prior litigation. *See generally* Ex. 15.[1] In particular, Sinovac and its new Board, acting under 1Globe and OrbiMed's control, recently claimed that Prime Success's two equity investments in Sinovac and an affiliate, from 2018 and 2020, are both invalid—supposedly entitling them to deny Prime Success its corresponding shareholder rights to vote and receive dividends. *Id.* ¶ 86; Pet. ¶¶ 80–84.

The full background that led to this inflection point is presented in the Petition. The facts relevant to the limited, emergency injunctive relief Petitioner now seeks are more narrow—and largely undisputed.

---

[1] All citations to "Ex." are to exhibits attached to the Declaration of K. McKenzie Anderson.

In particular, it is ***undisputed*** that Prime Success currently holds approximately 8.14% of the registered common stock of Sinovac, as well as approximately 6.345% of the equity in its affiliate Sinovac Life Sciences Co., Ltd. ("Sinovac L.S."). Pet. ¶ 8. Prime Success received these equity interests in exchange for substantial investments of about $50 million in total. *Id.* ¶ 4. Prime Success's shareholdings are reflected in all relevant official records; they have been documented in SEC filings, certificates, and official registers for years. *Id.* ¶¶ 8, 55.

As to Sinovac, Prime Success possesses official share certificates for its 5.851 million shares of Sinovac common stock as documented on the official register. *Id.* ¶¶ 8–9. Less than two weeks ago, Respondents filed an application for interim relief in Antigua acknowledging Prime Success's ownership interest. Ex. 17 ¶ 21. As a holder of registered shares, Prime Success is by law "equal in all respects" to any other shareholder and entitled to "the right to vote at any meeting of shareholders" and to "receive any dividend declared by the corporation." Antigua International Business Corporation Act §§ 28, 105(2), 111. Thus, to prevent Prime Success from exercising its indisputable rights—including its right to vote 1Globe and OrbiMed out of power at the upcoming shareholder meeting—Respondents have asked the Antiguan court for emergency relief to ***alter*** the status quo by ***changing*** the "register of shareholders of the Company" through the "deletion of any entries in respect" of "the Prime Success Shares (save for the 48,577 Prime Success Shares which are no longer beneficially owned by Prime Success or its affiliates)," based on their claim that Prime Success's investment agreement is invalid. Ex. 17 ¶ 93(e)(ii).

Prime Success also currently holds approximately 6.345% of the equity of Sinovac L.S. Pet. ¶ 8. Again, this is undisputed: Respondents admit that Prime Success holds this interest. Ex. 15 ¶¶ 89.4, 96.5. Here too, Respondents are asking the Antiguan court to ***alter*** the status quo by invalidating Prime Success's investment agreement. *Id.* ¶ 105.3.

Prime Success provided substantial consideration for the equity it owns in both entities. In July 2018, Prime Success paid $43.365 million for 5.9 million Sinovac shares, at a share price that was recommended by Houlihan Lokey. Pet. ¶¶ 54–55. The Securities Purchase Agreement ("SPA") was executed for Sinovac by its then—and current—CEO and President, Dr. Weidong Yin. Ex. 1. Under the Company's Articles of Incorporation, the acts of the President of Sinovac— like his execution of the SPA—"bind the Corporation as if the said act had been approved by the Board of Directors." Ex. 7, Art. IV. Later, in May 2020, Prime Success paid another $7.5 million for equity in Sinovac L.S., pursuant to a Convertible Loan Agreement ("CLA"). Pet. ¶ 61; Ex. 2. The CLA was executed by Dr. Yin in his capacity as Executive Director, and Dr. Yin has been a Director of Sinovac L.S. from his founding of that entity in 2009 to the present. Pet. ¶ 62; Ex. 2 at 16. The Board of Sinovac L.S. that approved this investment has never been the subject of any challenge. Pet. ¶ 62.

Both of these investment agreements require mandatory arbitration of any dispute as to the contract's formation, validity, and existence. Ex. 1 § 6.10(b); Ex. 2 § 11.2. Separately, the SPA authorizes Prime Success to seek "an injunction or injunctions to prevent breaches of this Agreement and to specific performance of the terms hereof." Ex. 1 § 6.12. The parties stipulated that breaches would cause "irreparable damage" and that in pursuing an injunction no bond would be required, the Company would waive "the defense of adequacy of a remedy at Law," and Prime Success would not be construed as electing remedies or waiving any other right or remedy. *Id.* In other words, the parties agreed that challenges to the validity and existence of the SPA could only be resolved via arbitration—but in the meantime, the parties could seek injunctive relief to maintain the status quo, as Petitioner does here.

Prime Success made these investments seven and five years ago, respectively.  Pet. ¶ 98. But more than eight years ago, 1Globe and OrbiMed developed a secret plan to take over the Company—which they recently accomplished.  *Id.* ¶¶ 2, 37–38.  Without making any prior disclosures, 1Globe and OrbiMed ambushed the Company's Board and shareholders at an Annual General Meeting ("AGM") in February 2018.  *Id.* ¶¶ 2, 38.  1Globe was sanctioned for this misconduct by the SEC, Ex. 5, but its violations allowed it to secretly amass voting control and win the shareholder vote.  When Sinovac's old Board did not acknowledge the legitimacy of this ambush, extensive litigation ensued.  *Id.* ¶ 39.  And when 1Globe did not get its way in the courts, it engaged in serious criminal conduct to try to seize control over Sinovac, including numerous acts of forgery for which the head of 1Globe China is currently incarcerated.  *Id.* ¶ 51.  The specifics of this saga are set forth in the Petition.  *Id.* ¶¶ 42–51.

As relevant here, 1Globe sued Sinovac in Antigua in early 2018, claiming that (i) its alternative slate of directors should have been put in power based on the AGM vote, and (ii) any actions by the old Board after the AGM were "null and void."  Ex. 3 ¶ 3.  1Globe lost on both issues and appealed only on the first one.  Pet. ¶ 77.  To be precise, after it lost at trial in December 2018, 1Globe **abandoned** its claim that post-AGM actions by the old Board were null and void. *Id.* ¶ 69.  Eventually, in January 2025, 1Globe won on the first issue in the Privy Council, which ruled that 1Globe's alternative slate of directors should have been put in power in February 2018 despite 1Globe's ambush. Ex. 8 ¶ 88.  But the Privy Council did not suggest that all actions taken by Sinovac over the intervening seven-year period were void as a result.  *Id.*  To the contrary, when the Privy Council raised that question at argument, 1Globe expressly abandoned any appeal of its loss at trial on that issue—informing the Privy Council that "the relief below that was sought also included a declaration as to the validity of the acts of the directors in the intervening period, but I

think that's too complex of a matter at this stage of the day[.]"  Video of 11 July 2024 Afternoon Session, *1Globe Capital LLC v. Sinovac Biotech Ltd.*, No. JCPC/2022/0041 at 2:05:15–48, https://jcpc.uk/cases/jcpc-2022-0041#watch-hearings.

Nevertheless, Sinovac's new Board has made clear in recent weeks that it will not honor Prime Success's rights as a long-term shareholder.  In March 2025, Vivo initiated an arbitration at HKIAC (the "HK Arbitration") to confirm the validity of its investment in Sinovac from 2018, which Prime Success joined shortly thereafter.  Pet. ¶¶ 77–79.  The new Sinovac Board then announced the upcoming payment of shareholder dividends on or about July 9, 2025, and an upcoming shareholder meeting to elect a new board on July 8, 2025.  *Id.* ¶¶ 90–91.  But Sinovac stated that Prime Success would not be permitted to participate or benefit from either.  *Id.* ¶¶ 87–89.  In subsequent discussions, Sinovac would not even agree to escrow Prime Success's portion of the dividends.  *Id.* ¶ 78; Ex. 26.

On May 6, 2025, nearly two months after the HK Arbitration was initiated, Respondents filed a new case in Antigua seeking to invalidate Prime Success's investment agreements and to delete Prime Success's shares from the Sinovac registry.  *Id.* ¶ 80; Ex. 15.  And ten days ago, Respondents served a motion for emergency injunctive relief in the Antiguan court seeking to block Prime Success from voting at the July 8 shareholder meeting—to entrench 1Globe's and OrbiMed's power—and the court's blessing of Sinovac's plan to withhold and redistribute the dividends to which Prime Success is entitled. Ex. 16 ¶¶ 1, 4.

## ARGUMENT

This Court should maintain the status quo while the HK Arbitration proceeds.  It should not allow Respondents to circumvent that arbitration through their promised violations of Prime Success's rights under the investment agreement that is the subject of arbitration or their improper filing in Antigua seeking approval of such violations.

## I.    THIS COURT HAS SUBJECT MATTER JURISDICTION

There is no question of this Court's subject matter jurisdiction.  Under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, implemented at 9 U.S.C. §§ 201–208 (the "Convention"), "[t]he district courts of the United States … shall have original jurisdiction" over "[a]n action or proceeding falling under the Convention." *Id.* § 203; *see also id.* § 206.  The SPA governing Prime Success's investment in Sinovac "falls under the Convention" because it includes an "arbitration agreement … arising out of a legal relationship … which is considered as commercial" and is not "entirely between citizens of the United States." *Id.* § 202; Ex. 1 § 6.10.  The same is true of the CLA governing Petitioner's investment in Sinovac L.S.  Ex. 2 § 11.2.

As the Second Circuit has explained, courts have jurisdiction under the Convention to "entertain[] an application for a preliminary injunction in aid of arbitration." *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 826 (2d Cir. 1990); *see Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1052–53 (2d. Cir. 1990) (similar).  This is true "even where the request for [provisional] remedies" in aid of arbitration does "not accompany a motion to compel arbitration or confirm an award." *Venconsul N.V. v. Tim Int'l N.V.*, 2003 WL 21804833, at *3 (S.D.N.Y. Aug. 6, 2003).  This Court is vested with jurisdiction to "provide provisional remedies" in aid of arbitration even where the underlying contractual dispute must be arbitrated in another jurisdiction, *Rogers, Burgun, Shahine & Deschler, Inc. v. Dongsan Constr. Co.*, 598 F. Supp. 754, 758 (S.D.N.Y. 1984), or the parties are foreign, *see Venconsul*, 2003 WL 21804833, at *3.

Moreover, as to Petitioner's request for an anti-suit injunction, it "is beyond question that a federal court may enjoin a party before it from pursuing litigation in a foreign forum."

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004). The Court is authorized to grant such relief to maintain the status quo while an arbitration proceeds. *Forbes IP (HK) Ltd. v. Media Bus. Generators, S.A. de C.V.*, 2024 WL 1743109, at *4–5, 9 (S.D.N.Y. Apr. 23, 2024) (requiring party to withdraw injunction obtained in Mexico and cease litigation there to allow arbitration to proceed). These precepts reflect that "[f]ederal policy strongly favors the enforcement of arbitration agreements." *Paramedics*, 369 F.3d at 653.

## II.    PRIME SUCCESS IS ENTITLED TO EMERGENCY INJUNCTIVE RELIEF

A preliminary injunction in aid of arbitration is governed by "the same … standard for preliminary injunctions in other contexts." *Thales Avionics, Inc. v. L3 Techs., Inc.*, 719 F. Supp. 3d 337, 344 (S.D.N.Y. 2024); *accord Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010). Thus, Petitioner "must show: '(1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [petitioner's] favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the [petitioner's] favor; and (4) that the public interest would not be disserved by the issuance of an injunction.'" *Thales*, 719 F. Supp. 3d at 344–45 (citing *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d. Cir. 2015); *Citigroup Glob. Mkts. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010)). The standard for a TRO is the same. *Helio Logistics, Inc. v. Mehta*, 2023 WL 1517687, at *2 (S.D.N.Y. Feb. 3, 2023) (applying "same standards" to preliminary injunction and TRO) (citation omitted).

In addition to its authority to grant equitable relief under Rule 65 of the Federal Rules of Civil Procedure, this Court also has authority to issue the requested relief under Rule 64. Where

federal jurisdiction exists (as it does here under the Convention), Rule 64 "incorporates state-law provisional remedies," including in New York "an injunction in aid of arbitration pursuant to CPLR § 7502(c)," which "permits a court to order an … injunction in aid of arbitration where it appears that an award 'may be rendered ineffectual without such provisional remedy.'" *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994) (quoting CPLR 7502(c)).  Requests for injunctive relief under CPLR 7502(c) "incorporate[] the equitable criteria traditionally required for the granting of preliminary injunctive relief," *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 81 (2d Cir. 2000), meaning the analysis is similar to the default preliminary injunction analysis under federal law.  Given the overlap, this memorandum primarily focuses on the federal standard.  Each element of that standard is satisfied.

### A.    Prime Success Is Likely To Succeed On The Merits And, At A Minimum, Raises Serious Questions On The Merits.

Petitioner is likely to succeed on the merits.

*First*, as to whether to issue an anti-suit injunction, the likelihood of success question is simple:  "the correct question is whether Petitioner is likely to succeed on its claim that the [foreign proceeding] ran afoul of the Agreement" to arbitrate.  *Forbes*, 2024 WL 1743109, at *7 (cleaned up).  On that issue, two questions matter:  "(1) whether there exists a valid agreement to arbitrate at all under the contract in question … and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement."  *Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (cleaned up).  The answer to both questions here is a resounding yes:  the governing investment agreements unequivocally require any disputes regarding their formation, validity, or existence to be adjudicated by arbitration.

The SPA requires that "[a]ny dispute, claim, controversy or difference arising out of or in connection with [the SPA] or the transactions contemplated hereby, *including any question*

*regarding its existence, validity*, interpretation, performance or termination or any dispute regarding any noncontractual obligation arising out of or in connection with it (a 'Dispute'), shall be determined by arbitration administered by the [HKIAC]."  Ex. 1 § 6.10(b) (emphasis added). Similarly, the CLA provides that "[a]ll disputes arising out of or in connection with" the CLA "shall be settled at the China International Economic and Trade Arbitration Commission" in Beijing.  Ex. 2 § 11.2.

Both agreements require arbitration, broadly, including as to contract validity and formation.  And even if there were a dispute about whether the claims fit within these arbitration clauses, that too would be a question for arbitration.  Indeed, Sinovac is arbitrating the question of arbitrability in the HK Arbitration.  Pet. ¶ 5.  Petitioners therefore are likely to succeed in showing that the potential invalidity of Prime Success's shares can only be resolved in arbitration.  *Compare Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121–22, 125 (2d Cir. 2003) (arbitration agreement providing "[a]ll disputes … concerning or arising out of" the agreement be arbitrated and that "arbitration [is] to be conducted under the rules of the ICC … clearly and unmistakably evidences the parties' intent to arbitrate questions of arbitrability"), *with* Ex. 1 § 6.10(b) (providing "[a]ny dispute, claim, controversy or difference arising out of or in connection with" the SPA be arbitrated "in accordance with the HKIAC Administered Arbitration Rules"); *see also* HKIAC 2024 Arb. R. 19.1 ("The arbitral tribunal may rule on its own jurisdiction under these Rules, including any objections with respect to the existence, validity or scope of the arbitration agreement."),    https://www.hkiac.org/arbitration/rules-practice-notes/administered-arbitration-rules/hkiac-administered-2024-1.[2]

---

[2] It does not matter that 1Globe and OrbiMed have joined Sinovac in Antigua in seeking to invalidate Prime's agreement with Sinovac.  Sinovac cannot avoid the mandatory arbitration

**Second**, Prime Success is likely to succeed on the merits of the dispute as to what rights it currently holds—*i.e.*, what the status quo is—because Respondents admit that Prime Success currently owns common stock in Sinovac and equity in Sinovac L.S. *Supra* at 5. There is no meaningful dispute here: Prime Success owns registered Sinovac stock, entitling it to vote at shareholder meetings and receive dividends. *Id.* Contrary to Respondents' claims, the Privy Council did not change the status quo as to Prime Success's shareholder rights. That court did not rule that any of Prime Success's investment agreements is "null and void." Just the opposite, 1Globe **lost** on that issue in the lower Antiguan courts, and then expressly abandoned it at the Privy Council. Pet. ¶ 69. There has been no ruling, in any forum, that either the SPA or CLA is invalid— meaning that Prime Success continues be a shareholder. Indeed, that is undisputed—and that is why Respondents rushed into the wrong forum to try to **alter** Prime Success's current status as a shareholder with rights equal to all other shareholders.

Prime Success's current shareholder status should be preserved pending resolution of the dispute about the validity of its investments in the arbitration. Preserving the status quo—where the status quo is clear—is within this Court's plain authority. "A preliminary injunction in aid of arbitration 'preserve[s] the status quo pending arbitration,' and prevents arbitration from 'becom[ing] a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision.'" *Thales*, 719 F. Supp. 3d at 344 (quoting *Blumenthal*, 910 F.2d at 1053). "The 'status quo' in preliminary-injunction parlance is really a 'status quo

---

clause by the expedient of having a non-party shareholder join it as a claimant in the wrong forum. *See Lapina v. Men Women N.Y. Model Mgmt. Inc.*, 86 F. Supp. 3d 277, 285 (S.D.N.Y. 2015) (a signatory party "cannot avoid arbitration for which they had contracted simply by adding a non-signatory [party]"); *Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 479–80 (S.D.N.Y. 2020) (nonsignatory can be bound to arbitration agreement by equitable estoppel upon "bringing suit under that agreement," but deferring arbitrability issue for arbitrator).

ante,'" *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018), and "courts of equity have long issued preliminary injunctions requiring parties to *restore* the status quo ante," *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (emphasis in original). Here there is no dispute that the status quo—before Respondents threatened to violate Prime Success's rights and asked the courts of Antigua to authorize them to do so—was that Prime Success was (and indeed still is) a registered shareholder of Sinovac, entitled to all rights of a shareholder. *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, at *5 (S.D.N.Y. Dec. 10, 2003) (granting preliminary injunction pending arbitration to prevent creditor from triggering default that would cause plaintiffs to lose their shareholdings).

*Third*, although not necessary for the requested injunctive relief (which merely seeks to preserve the status quo pending arbitration), Prime Success is likely to succeed on the merits of the ultimate arbitrations.[3]

For starters, Sinovac is bound by the SPA because Dr. Yin had actual authority to execute it. Dr. Yin, as Sinovac's President and CEO, executed the SPA in his capacity as the head of management—not as a director—pursuant to his authority to "bind the Corporation as if the said act had been approved by the Board of Directors." Pet. ¶ 56. Respondents have never challenged Dr. Yin's authority as the Company's President and CEO and have retained Dr. Yin in that position even now, after their takeover. Thus, Dr. Yin validly bound the Company pursuant to his

---

[3] Although some federal courts have addressed this question of the ultimate merits, *see, e.g.*, *Thales*, 719 F. Supp. 3d at 345–47, New York law specifies that it should not be considered. *See* CPLR 7501 ("In determining any matter arising under this article, the court shall not consider whether the claim with respect to which arbitration is sought is tenable, or otherwise pass upon the merits of the dispute."); *Denihan v. Denihan*, 119 A.D.2d 114, 147–49 (1st Dep't 1986) (in considering a petition for a preliminary injunction in aid of arbitration, a court need not consider the merits of the underlying dispute).

independent authority under the Company's Articles, and Prime Success was entitled to rely on such authority in executing the parties' agreement.

Respondents' argument is that Dr. Yin lacked actual authority as a ***director*** given the Privy Council's ruling. *See* Ex. 15. Yet even if he had signed the SPA as a director, he was acting with apparent or ostensible authority to bind the Company. Sinovac operated for seven years under the control of the former Board, with great success. Respondents cannot selectively repudiate one contract that does not suit them as self-interested shareholders and validate every other corporate action from those years. Yet that is what they seek to do. Since taking control, Respondents have not challenged ***any*** corporate action by Sinovac over the past seven years ***except*** for the investments of Prime Success and Vivo—because it is only by repudiating those investments (and the shares and voting rights they provide) that 1Globe and OrbiMed can hope to retain their control over Sinovac. Pet. ¶ 83.

If Respondents' challenge to the SPA were truly a principled stance based on the Privy Council's judgment, Respondents would be repudiating seven years of actions approved by the old Board, including construction contracts, partnerships, other investments, and more. They have shown no interest in doing so. Respondents are targeting ***only*** Prime Success and Vivo because 1Globe and OrbiMed want to entrench their power and steal for themselves the dividends that Prime Success's and Vivo's investments helped to create. Indeed, Respondents are not even uniformly repudiating the SPA, instead trying to invalidate only the portion of the 5,900,000 shares issued to Petitioner that it still retains; they are perfectly fine with Petitioner's transferee of shares receiving dividends and voting. Respondents are cherry-picking to target shareholders who oppose them. In fact, Respondents' challenge to the CLA between Prime Success and Sinovac L.S. makes that clear. Pet. ¶ 62; Ex. 15. The Privy Council never addressed the Board of Sinovac L.S., and

that Board remains unchanged even today.  Ex. 8.  That 1Globe and OrbiMed are nevertheless seeking to invalidate even the CLA as "unauthorized," Ex. 15 ¶¶ 76.3, 85.2, betrays their true purpose to disenfranchise shareholders who will vote them out of office.  The HK Arbitrators will easily see through Respondents' self-interested, selective repudiation of Prime Success's investment agreements.

At minimum, Petitioner's "claims present serious questions as to the merits, and the balance of hardships tips decidedly in [Petitioner's] favor." *Thales*, 719 F. Supp. 3d at 345.  "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *R Squared Glob. v. Serendipity 3, Inc.*, 2011 WL 5244691, at *9 (S.D.N.Y. Nov. 3, 2011) (quoting *Citigroup Global*, 598 F.3d at 35).  As shown below, the balance of hardships tips decidedly in Petitioner's favor.

### B.    Prime Success Will Suffer Irreparable Harm Absent Injunctive Relief

Petitioner easily satisfies the irreparable harm standard.  Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  A finding of irreparable harm is appropriate when money damages are not available or would be inadequate to cure the harm.  *See WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (irreparable harm is "harm to the

plaintiff's legal interests that could not be remedied after a final adjudication," such as when "the loss is difficult to replace or measure").

**First**, the loss of arbitration in the agreed forum for disputes over the validity of Prime Success's investments is irreparable harm.  "Without a preliminary injunction, the harm that Petitioner seeks to address via arbitration"—Respondents' attempt to divest Prime Success of its shares, voting rights, and dividends—"will occur before the arbitrator can render a decision, and Petitioner will lose its right to meaningfully resolve these … disputes via arbitration.  This constitutes irreparable harm." *Credit Suisse Sec. (USA) LLC v. Ebling*, 2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006); *Genius Grp. v. LZG Int'l, Inc.*, 2025 WL 815346, at *5 (S.D.N.Y. Mar. 13, 2025) ("the loss of the right to have a dispute decided by arbitration when arbitration is the agreed upon means of resolution … is itself an irreparable injury").

For this reason, courts issue anti-suit injunctions to ensure that issues of contract validity are decided in the forum selected by contract.  *E.g.*, *Storm LLC v. Telenor Mobile Comm'ns AS*, 2006 WL 3735657, at *8–10 (S.D.N.Y. Dec. 15, 2006) (enjoining defendant from continuing foreign action challenging validity of agreement).

**Second**, if Respondents are able to deprive Prime Success of its shareholder rights before the validity of Prime Success's investment is adjudicated by arbitration, the injuries to Prime Success will be irreparable.  The loss of shareholder status is a well-recognized form of irreparable harm.  *E.g., Suchodolski*, 2003 WL 22909149, at *4 (plaintiffs who stood to "lose both their shares and their ability to participate in the business of [the company]" showed irreparable harm because "[t]he dilution of a party's stake in, or a party's loss of control of, a business constitutes irreparable harm"); *Clark v. Pattern Analysis & Recognition Corp.*, 87 Misc.2d 385, 386 (N.Y. Sup. Ct. 1976)

17

("no question" that plaintiffs would be irreparably harmed because "they would lose their status as shareholders").

So too is the loss of shareholder voting rights specifically. The loss of "free exercise of shareholders' voting rights" is an irreparable harm. *Krauth v. Exec. Telecard, Ltd.*, 890 F. Supp. 269, 287 (S.D.N.Y. 1995); *see also Lichtenberg v. Besicorp Grp.*, 43 F. Supp. 2d 376, 390 (S.D.N.Y. 1999) (shareholders irreparably harmed when deprived of "opportunity to make a fully informed decision and vote"). 1Globe and OrbiMed are on a mission to entrench their power over Sinovac by depriving Prime Success and Vivo (which together own more than 16% of the Company) of the right to vote them out of office. A loss of voting rights cannot be undone.

And so is the loss of shareholder dividend rights. 1Globe and OrbiMed's plan to pay Prime Success's dividends to themselves and other shareholders—thereby enriching themselves and consolidating power by buying other shareholders' loyalty—could not be undone and again constitutes irreparable harm. *Unilever Acquisition Corp v. Richardson-Vicks, Inc.*, 618 F. Supp. 407, 410 (S.D.N.Y. 1985) (finding irreparable harm in "the impermissible issuance of the preferred stock dividend," which would "severely limit if not eliminate" the plaintiff's ability "to control and/or influence the management and future course of [the company]"). If Sinovac pays the hundreds of millions of dollars it owes to Prime Success to third parties, that money could be gone forever. Yet Sinovac has refused even to escrow those funds.

***Third***, on top of the facts showing irreparable harm, the parties expressly agreed that irreparable harm exists here, that remedies at law would be inadequate, and that damages would be difficult to determine. Ex. 1 § 6.12. That agreement merits deference. *See Benihana*, 784 F.3d at 896.

**C.      The Balance Of Hardships Tips Decidedly In Prime Success's Favor**

The balance of hardships weighs in Petitioner's favor.  The relief Petitioner seeks will "simply maintain[] the parties' existing obligations" under the relevant agreements until the dispute can be resolved through the agreed contractual mechanism.  *R Squared*, 2011 WL 5244691, at *8.  This is not a significant hardship for Respondents, who chose not to pursue invalidation of the SPA at the Privy Council, after failing to invalidate it in the Antiguan trial court.  Respondents have suddenly chosen to resurrect that same demand, forcing Sinovac to pivot 180-degrees from the position it took for seven years, but allowing them to ***assume*** success would upset the apple cart and render their takeover all but permanent—entrenching their power by *changing* the status quo to cancel Prime Success's rights.  Issuing the requested injunctions will merely "preserve the status quo," where Prime Success is treated like any other shareholder, "until the parties have an opportunity to resolve their dispute in arbitration, as provided in the [relevant a]greement[s]."  *Rex Med.*, 754 F. Supp. 2d at 625; *see also R Squared*, 2011 WL 5244691, at *8 ("Granting … motion for injunctive relief [that] simply maintains the parties' existing obligations.").

In contrast, without injunctive relief, "there is a realistic danger that [Petitioner] will lose [its] contractual right" to be treated with the rights afforded to other Sinovac shareholders "before the arbitral tribunal is able to issue a decision, thus rendering meaningless the parties' agreement to arbitrate" the validity of the SPA.  *Thales*, 719 F. Supp. 3d at 349.  Prime Success "should not have to suffer irreparable harm to save" Sinovac from its contractual obligations.  *Rex Med.*, 754 F. Supp. 2d at 625.  Because "the negative impact on [Petitioner] were this Court to deny its motion far outweighs the negative impact on [Respondents] were this Court to rule otherwise," the balance of hardships tips decidedly in favor of injunctive relief.  *See R Squared Glob.*, 2011 WL 5244691,

19

at *8 ("The balance of equities tips decidedly in favor of requiring that the parties continue fulfilling their obligations under the Agreement.").

### D.    An Injunction Furthers The Public Interest

Finally, the public interest will be furthered by an injunction. The Court's "sole [] task" here "is to confirm that granting injunctive relief would not disserve the public interest." *Rex Medical*, 754 F. Supp. 2d at 626. It is well-established that there is a strong public interest "in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense," *id.*, including by holding parties to their agreements to arbitrate or litigate their claims in specific forums, *e.g.*, *Forbes*, 2024 WL 1743109, at *5 ("[T]here is a strong public policy in enforcing forum selection clauses."); *Paramedics*, 369 F.3d at 654 ("The federal policy favoring the liberal enforcement of arbitration clauses … applies with particular force in international disputes."); *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009) (noting "the strong public policy in favor of international arbitration"). There can be no serious dispute that enforcing the parties' agreements to arbitrate and "preserving the arbitrators' ability to order effective relief" will further these policies. *Thales*, 719 F. Supp. 3d at 349 (injunction in aid of arbitration "further[ed] … federal public policy in favor of arbitration"); *Espiritu Santo Holdings, LP v. L1bero Partners, LP*, 2019 WL 2240204, at *26 (S.D.N.Y. May 14, 2019) (same, as to policy in favor of "enforcing the parties' bargained-for agreement"); *Forbes*, 2024 WL 1743109, at *7 (similar).

### E.    Prime Success Easily Satisfies Additional Factors for Anti-Suit Injunction

Finally, the additional factors considered for anti-suit injunctions are also met.

***Substantially similar parties.*** For an anti-suit injunction to issue, the named parties in the U.S. court and foreign action "need not be identical, so long as there is a 'finding of substantial

similarity and affiliation.'" *Bank Leumi USA v. Ehrlich*, 2015 WL 12591663, at *4 (S.D.N.Y. Sept. 23, 2015) (quoting *Paramedics*, 369 F.3d at 652). In considering the relationship of the parties, the Court looks only to the parties to the U.S. action and the *claimants* in the foreign proceeding who would be enjoined—it is irrelevant whether there are additional *respondents* in a foreign proceeding. *Id.* (holding "same parties" element met where Bank Leumi sought an injunction requiring foreign claimants to "dismiss … the claims they asserted against [it] in the [foreign] action," but requested no relief as to other defendants in the foreign case).

Here, the overlap between the parties to this case and the claimants in the foreign action is complete. Although Vivo is not a party to this action, Vivo's involvement in Antigua is not necessary to the relief Respondents seek against *Prime Success* in Antigua, and Petitioner only seeks an order requiring Respondents to withdraw their claims *against Prime Success*. As in *Bank Leumi*, there can be no serious dispute that "*those* parties are the same." *See id.* Plainly, Sinovac cannot avoid its agreement to arbitrate by joining other parties to its meritless claims against Prime Success.[4]

*Dispositive resolution.* Resolution of this matter also would be "dispositive of the enjoined action." *Id.* (quoting *China Trade & Development Corp.*, 837 F.2d 33, 36 (2d Cir. 1987)). Where, as here, the "case before the enjoining court here concerns the arbitrability of the parties' claims[,] [] the question under *China Trade* is whether the ruling on arbitrability is dispositive of the [foreign] litigation, even though the underlying disputes are confided to the arbitral panel and will not be decided by the enjoining court." *Paramedics*, 369 F.3d at 653. This standard is met. *Id.*;

---

[4] The inclusion of additional parties here, namely Relief Respondents Equiniti and DTC and Respondents OrbiMed Advisors and OrbiMed Capital, does not change this result, as they are all "affiliates" of parties to the Antigua action—Cede & Co. and OrbiMed Partners, respectively. *See Deutsche Mexico Holdings S.a.r.l. v. Accendo Banco, S.A.*, 2019 WL 5257995, at *5 (S.D.N.Y. Oct. 17, 2019) ("Naming the affiliate does not change the real parties in interest.").

*see also Forbes*, 2024 WL 1743109, at *5 ("Necessarily then, a ruling here, holding that the Mexico Injunction was obtained in violation of the Agreement will be dispositive of the Mexico Injunction."). All relief sought by Respondents from Prime Success in the Antigua case turns on the supposed invalidity of Prime Success's investments. Because the question of invalidity is arbitrable, granting relief here would dispose of the Antigua action.

*Discretionary factors.* Courts also consider "a number of additional factors, including whether the parallel litigation would: (1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 119 (2d Cir. 2007) (cleaned up) (quoting *Ibeto Petrochemical Indus. v. M/T Beffen*, 475 F.3d 56, 64 (2d Cir. 2007)). Each factor favors an injunction.

(1) If not enjoined, the Antiguan proceedings will frustrate the strong federal policy of enforcing arbitration provisions. *Supra* 10, 20. This country has a strong policy in favor of international arbitration, as exemplified by the creation of a federal cause of action under the Convention to enforce foreign arbitration agreements. 9 U.S.C. § 201 *et seq.*; *Telenor*, 584 F.3d at 410. Respondents' filing of the Antigua case notwithstanding the governing arbitration agreements frustrates both United States and New York policy. *E.g.*, *Paramedics*, 369 F.3d at 654 (finding the "consideration[] [of] whether the foreign proceeding threatens a strong public policy … of the domestic forum … salient" where the foreign action was "filed 31 days after [the] notice and request for arbitration … []as a tactic to evade arbitration").

(2) The Antiguan proceeding is vexatious. Respondents have admitted that Prime Success's shares have not been cancelled and that they remain on Sinovac's register. *Supra* 5, 13.

1Globe, having previously sought and abandoned its request to invalidate actions by the old Board in the prior Antigua litigation, has now forced Sinovac to make that same request (solely as to Prime Success and Vivo) in new the Antigua litigation—to avoid the HK Arbitration.  This attack is retaliatory and not principled or consistent—it is a selective repudiation of one Sinovac contract, not a uniform approach to repudiate every Board action over seven years.  The Second Circuit has directed courts to "restrain" such vexatious litigation.  *Forbes*, 2024 WL 1743109, at *5.

(3)  The Antigua proceedings "threaten[] the jurisdiction or the strong public policies of the enjoining forum," *Karaha Bodas*, 500 F.3d at 124, including this Court's jurisdiction to confirm and enforce an eventual arbitration award against Sinovac, s*ee* 9 U.S.C. § 207; *see also* 28 U.S.C. § 1651.  Without emergency relief, Respondents will soon pay dividends rightly owed to Prime Success—funds that reside in New York, and over which this Court has *in rem* jurisdiction—to parties outside this Court's jurisdiction.  Pet. ¶ 28; *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 397–98 (2d Cir. 2009) (petitions to "confirm foreign arbitral awards pursuant to the New York Convention" may be premised on *quasi-in-rem* jurisdiction).  Injunctive relief is thus warranted to protect this Court's jurisdiction.

(4, 5)  The remaining factors also favor Petitioner.  "If forced to litigate in [Antigua], [Petitioner] will have to spend time and expense litigating in several forums, despite the forum selection clause, while [Respondents] will still have the opportunity to litigate [their] claims in … [a]rbitration." *Res. Grp. Int'l v. Chishti*, 2024 WL 4135304, at *4 (S.D.N.Y. Sept. 10, 2024); *see also Forbes*, 2024 WL 1743109, at *6 (similar).  "[A]bsent a preliminary anti-suit injunction, [Petitioner] would be subject to the risk of unpredictable and inconsistent rulings," between the arbitrations, Antigua proceedings, and a court that would confirm any award.  *Res. Grp.*, 2024 WL 4135304, at *5 ("'specter of inconsistent rulings' constitutes irreparable harm" and warrants

"preliminary anti-suit injunction").  Respondents are trying to create a race to judgment by seeking emergency relief in the wrong forum.  They have no right to do so.

### F.    No Bond Should Be Required

Finally, no bond should be required.  The parties agreed in the SPA that "the Parties waive any requirement for the securing or posting of any bond in connection with the obtaining of … any injunctive relief."  Ex. 1 § 6.12.  The parties have therefore "waived the requirement" of bond. *Int'l Bus. Machs. Corp. v. De Freitas Lima*, 2020 WL 5261336, at *15 (S.D.N.Y. Sept. 3, 2020) (collecting cases).

## III.    THIS COURT HAS PERSONAL JURISDICTION OVER RESPONDENTS

Finally, there is no question of this Court's personal jurisdiction over Respondents based on the facts alleged in the verified Petition.  Pet. ¶¶ 26–32.  The Court has general personal jurisdiction over OrbiMed and the Relief Respondents because they are organized under New York law or have their principal place of business in New York.  CPLR 301; *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014).  And Respondents Sinovac and 1Globe are subject to this Court's jurisdiction under CPLR 302(a) because "in person or through an agent … [they] transact[] business within the state," and Petitioner's claim to preserve the status quo "arises from" that business.  *Ge Dandong v. Pinnacle Perf. Ltd.*, 966 F. Supp. 2d 374, 381 (S.D.N.Y. 2013).  There is "an articulable nexus … between the claim asserted and the actions that occurred in New York," of which even a "single act" will give rise to personal jurisdiction.  *Id.* (citation omitted).

**Sinovac.**  Several "agent[s] acted in New York for the benefit of, with the knowledge and consent of, and under some control by" Sinovac, giving rise to Petitioner's claim to preserve the status quo.  *Charles Schwab Corp. v. Bank of Am.*, 883 F.3d 68, 85 (2d Cir. 2018) (citation omitted).  Sinovac directors have targeted Petitioner while working from New York for OrbiMed,

a New York-based firm.  Pet. ¶¶ 26, 70–74, 87–90.  Such "acts performed [by directors] as fiduciaries of the corporation … confer jurisdiction over the corporation on behalf of which the director serves." *Kossoff v. Samsung Co. Ltd.*, 474 N.Y.S.2d 180, 185 (1984).  In addition, other agents acting to benefit Sinovac, at the expense of Petitioner, include:  (a) Sinovac's securities depository and clearing agent, DTC, which maintains the Sinovac stock register that Sinovac seeks to alter to Petitioner's detriment; (b) Cede & Co., which manages those securities for Sinovac's NASDAQ listing at the direction of DTC; and (c) Sinovac's paying agent, Equiniti, which has received, or will soon receive, the funds to pay dividends that Sinovac plans to wrongfully divert from Petitioner. Pet. ¶¶ 17–19; *Charles Schwab*, 883 F.3d at 85.  And Sinovac is listed, and is maneuvering to avoid its potential delisting as a result of its targeting of Petitioner, on the NASDAQ in New York.  *See* Pet. ¶¶ 9, 26, 35, 73–76.  Such "activities necessary to maintain a stock exchange listing," in conjunction with other New York activities, support a conferral of jurisdiction. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97–99 (2d Cir. 2000).[5]

**1Globe**.  Through its owner Chiang Li, who has established himself as the Chairman of Sinovac's Board (even though he was not on the slate from 2018), 1Globe has directed the activities of Sinovac's directors and agents in New York to act for its benefit.  Pet. ¶¶ 26, 69–76, 87–90.  In particular, the OrbiMed directors (who operate out of New York, where OrbiMed is based) are part of a consortium that is ultimately controlled by 1Globe.  *Id.* ¶¶ 36–45; *Charles Schwab*, 883 F.3d at 85.  Relatedly, under New York's conspiracy jurisdiction doctrine, this Court

---

[5]  Alternatively, this Court has personal jurisdiction over Sinovac pursuant to Federal Rule of Civil Procedure 4(k)(2), because Petitioner has asserted a federal claim pursuant to 9 U.S.C. § 203, and Sinovac is not subject to personal jurisdiction in any other state's court of general jurisdiction; and *quasi-in-rem* jurisdiction, because it maintains property subject to attachment or execution in this District, and the current action seeks to enjoin Sinovac's actions with respect to, and to preserve, such property.  Pet. ¶¶ 27–28.

has jurisdiction over 1Globe because (1) Petitioner has alleged adequate facts *prima facie* evidencing a conspiracy between 1Globe and New York-based OrbiMed to seize control of Sinovac and invalidate Petitioner's Sinovac shares and rights; (2) 1Globe is a member of that conspiracy; and (3) 1Globe acted in furtherance of the conspiracy by secretly acquiring Sinovac shares in violation of U.S. securities laws, as the SEC found and 1Globe consented to, and by directing Sinovac's New York directors and agents to take actions in New York against Petitioner. Pet. ¶¶ 36–51, 69–76, 87–90; *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 338–39 (S.D.N.Y. 2000) (setting forth elements of conspiracy jurisdiction).

There is no jurisdictional impediment to granting Prime Success relief to maintain the status quo.  Petitioner respectfully requests that the Court do so.[6]

## CONCLUSION

For these reasons, the Court should enter the proposed order that accompanies this memorandum of law.

---

[6]  If the Court finds these allegations insufficient but that Petitioner has "made a sufficient start toward establishing personal jurisdiction," then "[j]urisdictional discovery is warranted." *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 809 (S.D.N.Y. 2017) (citation omitted).

Respectfully submitted,

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Dated: New York, New York    By:    */s/ K. McKenzie Anderson*
June 12, 2025    K. McKenzie Anderson
Michael Swartz
Rachel E. Epstein
Morgan L. Anastasio (admission pending)
295 5th Avenue
New York, New York 10016-7103
Tel.: (212) 849-7000
mckenzieanderson@quinnemanuel.com
michaelswartz@quinnemanuel.com
rachelepstein@quinnemanuel.com
morgananastasio@quinnemanuel.com

B. Dylan Proctor (*pro hac vice* forthcoming)
Zach Meeker (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Tel.: (213) 443-3000
dylanproctor@quinnemanuel.com
zachmeeker@quinnemanuel.com

Sarah Heaton Concannon
Gregg Badichek
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW
Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
sarahconcannon@quinnemanuel.com
greggbadichek@quinnemanuel.com

*Attorneys for Petitioner Prime Success, L.P.*

27

## <u>CERTIFICATE OF WORD COUNT COMPLIANCE</u>

I, K. McKenzie Anderson,  an attorney duly admitted to practice before this Court, hereby certifies pursuant to Local Civil Rule 7.1(c) that this Memorandum of Law was prepared using Microsoft Word, and the document contains 8,439 words as calculated by the application's word-counting function, excluding the parts of the Memorandum exempted by Local Civil Rule 7.1(c).

I certify under the penalty of perjury the forgoing statements are true and correct. Executed on this 12th day of June, 2025 in New York, New York.

*/s/ K. McKenzie Anderson*
K. McKenzie Anderson

28