**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PRIME SUCCESS, L.P.

      Petitioner,

             v.

SINOVAC BIOTECH LTD., 1GLOBE
CAPITAL LLC, ORBIMED ADVISORS LLC,
ORBIMED CAPITAL LLC, ORBIMED
PARTNERS MASTER FUND LTD.,

      Respondents,

and

EQUINITI TRUST COMPANY LLC, CEDE &
CO., AND THE DEPOSITORY TRUST
COMPANY,

      Relief Respondents.

Case No. 1:25-cv-04989-RA

---

**RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER
PRIME SUCCESS, L.P.'S PETITION FOR EMERGENCY INJUNCTIVE RELIEF
<u>IN AID OF ARBITRATION</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

    A.    The Parties and Related Entities .................................................. 3

    B.    Sinovac's Former Incumbent Directors Attempt to Take Sinovac
        Private ........................................................................................... 4

    C.    The Former Incumbent Directors Lose a Board Election and
        Refuse to Cede Control ................................................................. 4

    D.    The Self-Dealing SPA and Issuance of PIPE Shares ................................. 5

    E.    The Management Consortium Siphons Cash, at the Expense of
        Sinovac Shareholders, through Its Control of a Subsidiary ..................... 7

    F.    Privy Council Ruling in January 2025 ...................................... 8

    G.    Sinovac Attempts to Clean Up the Mess Left Behind by the
        Former Incumbent Directors and the Management Consortium ............... 9

ARGUMENT ..................................................................................................... 10

    I.    Prime Success Is Not Entitled to Injunctive Relief................................ 10

        A.    Prime Success Cannot Show Irreparable Harm ........................ 11

        B.    Prime Success Cannot Demonstrate a Likelihood of Success on the
            Merits ........................................................................................... 14

        C.    The Balance of Hardships and the Public Interest Do Not Support
            Injunctive Relief........................................................................... 16

    II.    Prime Success Does Not Satisfy the Requirements for an Anti-Suit
        Injunction ..................................................................................... 18

        A.    Prime Success Does Not Satisfy the Threshold Requirements for
            an Anti-Suit Injunction ............................................................ 19

            1.    This Action and the Antiguan Action Involve Different
                Parties............................................................................... 19

            2.    This Action Is Not Dispositive of the Antiguan Action ............... 20

        B.    Discretionary Factors Also Weigh Against Issuance of an Anti-Suit
            Injunction ..................................................................................... 21

    III.    This Is the Wrong Forum for the Petition under the *Forum Non
        Conveniens* Doctrine .................................................................... 23

CONCLUSION................................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

## CASES

*Aenergy, S.A. v. Republic of Angola,*
    2021 WL 1998725 (S.D.N.Y. May 19, 2021),
    *aff'd*, 31 F.4th 119 (2d Cir. 2022) ................................................................24

*Aenergy, S.A. v. Republic of Angola,*
    31 F.4th 119 (2d Cir. 2022) ........................................................................24

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
    784 F.3d 887 (2d Cir. 2015)........................................................................13

*Borden, Inc. v. Meiji Milk Prods. Co., Ltd.,*
    919 F.2d 822 (2d Cir. 1990)........................................................................26

*C.D.S., Inc. v. Bradley Zetler, CDS, LLC,*
    213 F. Supp. 3d 620 (S.D.N.Y. 2016)........................................................22

*China Trade and Dev. Corp. v. M.V. Choong Yong,*
    837 F.2d 33 (2d Cir. 1987)................................................................. *passim*

*Computer Assocs. Int'l, Inc. v. Altai, Inc.,*
    950 F. Supp. 48 (E.D.N.Y. 1996),
    *aff'd*, 126 F.3d 365 (2d Cir. 1997) ..............................................................20

*Credit Suisse Sec. (USA) LLC v. Ebling,*
    2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006) ..........................................12

*Cybernaut Cap. Mgmt. Ltd. v. Partners Grp. Access Secondary 2008, L.P.,*
    2013 WL 4413754 (S.D.N.Y. 2013) ..........................................................21

*Emirates Int'l Inv. Co., LLC v. ECP Mena Growth Fund, LLC,*
    2012 WL 2198436 (S.D.N.Y. June 15, 2002) ...........................................12

*Empresa Generadora De Electricidad Itabo v. Corporacion Dominicana De*
    *Empresas Electricas Estatales ("CDEEE"),*
    2005 WL 1705080 (S.D.N.Y. July 18, 2005) ...............................11, 14, 21, 23

*Espiritu Santo Holdings, LP v. L1bero Partners, LP,*
    2019 WL 2240204 (S.D.N.Y. May 14, 2019),
    *aff'd*, 789 F. App'x 288 (2d Cir. 2020) .......................................................14

*Forbes IP (HK) Ltd. v. Media Bus. Generators,*
    2024 WL 1743109 (S.D.N.Y. Apr. 23, 2024)............................................14

*Genius Grp. Ltd. v. LZG Int'l, Inc.,*
    2025 WL 815346 (S.D.N.Y. Mar. 13, 2025) .............................................12

*Global Net Lease, Inc. v. Blackwells Cap. LLC*,
    2023 WL 3222417 (S.D.N.Y. May 3, 2023) ................................................10

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007).............................................................................11

*Hamilton Bank, N.A. v. Kookmin Bank*,
    999 F. Supp. 586 (S.D.N.Y. Apr. 15, 1998) .................................................22

*Holzman v. Guoqiang Xin*,
    2015 WL 5544357 (S.D.N.Y. Sept. 18, 2015).............................................26

*Hyundai Merchant Marine Co., Ltd. v. Mitsubishi Heavy Industries, Ltd.*,
    2015 WL 7758876 (S.D.N.Y. Dec. 1, 2015) ..............................................26

*ICBC Standard Securities, Inc. v. Luzuriaga*,
    217 F. Supp. 3d 733 (S.D.N.Y. 2016)..........................................................20

*In re SKAT Tax Refund Scheme Litig.*,
    2020 WL 400718 (S.D.N.Y. Jan. 23, 2020) ................................................21

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    886 F. Supp. 1120 (S.D.N.Y. 1995)............................................................17

*Johnson as Tr. of Johnson Fam. Tr. v. Saba Cap. Mgmt., L.P.*,
    2023 WL 1345717 (S.D.N.Y. Jan. 31, 2023) .............................................11

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
    917 F.2d 75 (2d Cir. 1990)...........................................................................11

*Krauth v. Executive Telecard Ltd.*,
    890 F. Supp. 269 (S.D.N.Y. 1995) ..............................................................12

*Laif X Sprl v. Axtel, S.A. de C.V.*,
    310 F. Supp. 2d 578 (S.D.N.Y. 2004),
    *aff'd*, 390 F.3d 194 (2d Cir. 2004)..........................................................17, 18

*Laker Airways Ltd. v. Sabena*,
    731 F .2d 909, 928–29 (D.C. Cir. 1984) ......................................................23

*Lichtenberg v. Besicorp Group Inc.*,
    43 F. Supp. 2d 376 (S.D.N.Y. 1999)............................................................12

*M.B. Int'l W.W.L. v. PMI Am., Inc.*,
    2012 WL 3195761 (S.D.N.Y. Aug. 6, 2012) ..............................................13

*Med. Soc'y of the State of N.Y. v. Toia*,
    560 F.2d 535 (2d Cir. 1977)..........................................................................10

*MyWebGrocer, LLC v. Hometown Info, Inc.*,
    375 F.3d 190 (2d Cir. 2004).........................................................................16

*Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*,
    81 F.3d 1224 (2d Cir. 1996).........................................................................16

*SG Cowen Sec. Corp. v. Messih*,
  224 F.3d 79 (2d Cir. 2000)..................................................................13, 14

*Space Imaging Europe, Ltd. v. Space Imaging L.P.*,
  1999 WL 511759 (S.D.N.Y. July 19, 1999) ...................................................21

*Stevenson v. Thornburgh*,
  2024 WL 645187 (S.D.N.Y. Feb. 14, 2024) ...................................................24

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
  646 F. Supp. 2d 510 (S.D.N.Y. 2009)..........................................................17

*Storm LLC v. Telenor Mobile Commc'ns AS*,
  2006 WL 3735657 (S.D.N.Y. Dec. 15, 2006) .................................................12

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*,
  2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) ...............................................12

*Thales Avionics, Inc. v. L3 Techs., Inc.*,
  719 F. Supp. 3d 337 (S.D.N.Y. 2024).........................................................14

*Touro Coll. v. Fondazione Touro Univ. Rome Onlus*,
  2017 WL 4082481 (S.D.N.Y. Aug. 31, 2017),
  *aff'd*, 738 F. App'x 25 (2d Cir. 2018)...........................................23, 24, 25, 26

*Unilever Acquisition Corp. v. Richardson-Vicks, Inc.*,
  618 F. Supp. 407 (S.D.N.Y. 1985) .............................................................13

*United States v. Davis*,
  767 F.2d 1025 (2d Cir. 1985).....................................................................18

*Venconsul N.V. v. TIM Int'l N.V.*,
  2003 WL 21804833 (S.D.N.Y. Aug. 6, 2003) ................................................11

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015).........................................................25

*WTA Tour, Inc. v. Super Slam Ltd.*,
  339 F. Supp. 3d 390 (S.D.N.Y. 2018).....................................................19, 20

## OTHER AUTHORITIES

Convention on the Recognition and Enforcement of Foreign Arbitral Awards
  Contracting States, https://www.newyorkconvention.org/contracting-states...................25

Respondents Sinovac Biotech Ltd. ("Sinovac" or the "Company"), 1Globe Capital LLC ("1Globe"), OrbiMed Advisors LLC, OrbiMed Capital LLC, and OrbiMed Partners Masters Fund Limited (collectively, "OrbiMed," and together with Sinovac and 1Globe, "Respondents") respectfully submit this memorandum of law in opposition to Petitioner Prime Success, L.P.'s ("Petitioner" or "Prime Success") petition for emergency injunctive relief in aid of arbitration.

## PRELIMINARY STATEMENT

This is an action commenced by a foreign entity, to enjoin a foreign proceeding, in favor of a different foreign proceeding, involving a foreign company, foreign conduct, and the application of foreign law that does not belong in this Court. An anti-suit injunction is an extraordinary and disfavored remedy. As the Second Circuit has held, foreign anti-suit injunctions "effectively restrict[] the jurisdiction of the court of a foreign sovereign" and therefore should be "***used sparingly***" and with "***great restraint***." *China Trade and Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35-36 (2d Cir. 1987) (emphasis added). This action does not meet the stringent requirements.

This lawsuit is one of several desperate legal actions commenced by Prime Success and a similarly situated nonparty, Vivo Capital, LLC ("Vivo") and their affiliates—members of a group that recently suffered a resounding defeat in a final, non-appealable order by the Judicial Committee of the Privy Council (the "Privy Council"), the highest court for United Kingdom overseas territories and Commonwealth countries—concerning control over Sinovac, an Antiguan company headquartered in China. That ruling determined that the former directors of Sinovac, who lost a board election in 2018 and refused to cede control thereafter, have been "imposters" ever since.

Prime Success received its purported shares in Sinovac pursuant to a 2018 Private Investment in Public Equity ("PIPE") transaction, during the time when the former members of

the board of directors were "imposters." Thus, the effect of the Privy Council's ruling is that the PIPE transaction is null and void and Prime Success is not a Sinovac shareholder. That very question is pending before an Antiguan court, which is the only forum equipped to determine the necessary results and effects of the Privy Council's judgment under Antiguan law. ***Indeed, Prime Success has participated in that action and has already asked the Antiguan court to stay those proceedings in favor of another forum—an arbitration it joined in Hong Kong, which is the exact relief Prime Success seeks here***. There is no reason this Court should reward Prime Success's gamesmanship and forum shopping and decide the same questions that are properly before the court in Antigua.

Petitioner's request for injunctive relief should be denied for multiple independent reasons.

*First*, Prime Success cannot show that it is entitled to injunctive relief. Prime Success does not need a TRO from this Court to pursue arbitration—it is already doing so. There is no chance of irreparable harm here either because, as Sinovac previously announced it would, Sinovac has deposited in an independent third-party escrow account the amount of the dividend Prime Success claims it is entitled to pending resolution of the issue of whether Prime Success's PIPE shares are invalid. In any event, Prime Success's concerns about a ***monetary*** dividend do not constitute irreparable harm. Prime Success also cannot show a likelihood of success on the merits in the underlying arbitration. Questions that go to the merits are governed by Antiguan law and Hong Kong law, yet Prime Success presents no authority from either jurisdiction showing it will likely win on its claims under those jurisdictions' laws. Finally, the balance of the equities weighs heavily against Prime Success's gamesmanship and forum shopping—the latest tactics in a prolonged, multi-year attempt to gain control of Sinovac and its substantial assets.

*Second*, Prime Success cannot satisfy the additional threshold requirements for an anti-suit injunction.  An anti-suit injunction is an extraordinary remedy that has the effect of trampling on the jurisdiction of a foreign court.

*Third*, pursuant to the *forum non conveniens* doctrine, this is the wrong forum.  Prime Success has already sought the same relief in the Antiguan court that it seeks here.  Antigua is thus the far better alternative forum.

## STATEMENT OF FACTS

### A.    The Parties and Related Entities

Respondent Sinovac is an Antiguan company based in China.  Pet. ¶ 9.[1]  Sinovac's business focuses on research, development, production and commercialization of vaccines that protect against infectious diseases.  *Id.* ¶ 35.  Sinovac is listed on NASDAQ, but trading in the Company's shares has been halted since February 2019.  *Id.*

Respondents 1Globe, OrbiMed Advisors LLC, and OrbiMed Capital LLC are Delaware entities, and Respondent OrbiMed Partners Masters Fund Limited is a Bermuda exempted company.  *Id.* ¶¶ 11, 13-15.  1Globe and OrbiMed are longtime shareholders in Sinovac.  *Id.* ¶¶ 11, 15.

Petitioner Prime Success is a limited partnership registered in the Cayman Islands that purports to be a shareholder in Sinovac.  *Id.* ¶ 8.  The general partner of Prime Success is Green Vision Partners Limited ("Green Vision") and, in turn, Advantech Capital Partners Ltd.

---

[1] Citations to "Petition" or "Pet." are to the Verified Petition of Prime Success, L.P. for Emergency Injunctive Relief in Aid of Arbitration.  ECF No. 1.  Citations to "Pet., Ex." are to the exhibits attached to the Declaration of K. McKenzie Anderson.  ECF No. 5.  Citations to "Motion" or "Mot." are to the Memorandum of Law in Support of Petitioner Prime Success L.P.'s Petition for Emergency Injunctive Relief in Aid of Arbitration.  ECF No. 4.  Citations to "Ex." are to the exhibits appended to the Declaration of Morris J. Fodeman accompanying this opposition brief.

("Advantech") is the shareholder of Green Vision.

Non-party Vivo controls multiple limited partnership funds and purports to be a shareholder in Sinovac.  *Id.* ¶ 20.

### B.    Sinovac's Former Incumbent Directors Attempt to Take Sinovac Private

Beginning in 2016, two competing shareholder consortia vied to acquire a controlling stake in Sinovac and take it private.  Pet., Ex. 8 ¶ 5.  One consortium was led by Vivo, Advantech, SAIF, and Sinovac's then-current management (the "Management Consortium"), including its board of directors at the time (the "Former Incumbent Directors").  *Id.*  The other consortium (the "Sinobioway Consortium") was led by Sinobioway Biomedicine Co. Ltd. ("Sinobioway"), a minority shareholder in one of Sinovac's major operating subsidiaries.  *Id.*

Between 2016 and 2017, the Management Consortium attempted to acquire and privatize Sinovac on the cheap and, when those attempts failed, they misused their fiduciary positions at Sinovac to block superior offers from the Sinobioway Consortium.  *Id.* ¶¶ 6-9.  On March 28, 2016, the Former Incumbent Directors adopted a Rights Agreement, which—in substance—was a "poison pill" that allowed the Former Incumbent Directors to dilute any other bidding consortium. *Id.*

### C.    The Former Incumbent Directors Lose a Board Election and Refuse to Cede Control

On December 28, 2017, Sinovac gave formal notice of its Annual General Meeting ("AGM"), to be held in Beijing on February 6, 2018, at which one item of business to be addressed was the re-election of the Former Incumbent Directors.  *Id.* ¶ 10.  Sinobioway published a press release on January 31, 2018, addressed to all shareholders, recommending that they attend the AGM and vote against the re-election of the Former Incumbent Directors.  *Id.* ¶ 11.

At the AGM, a motion was proposed to (i) amend the ballot paper to include an "Against

All" option to vote against the Former Incumbent Directors, (ii) remove all Former Incumbent Directors except Yuk Lam Lo, and (iii) nominate an alternative slate of directors, comprising Yuk Lam Lo and four new directors (the "New Directors"). *Id.* ¶ 14. Based on the votes cast at the AGM, the New Directors obtained a majority of the votes. *Id.* ¶ 15. However, the AGM concluded without a declaration of the results of the election by the scrutineer, who stated that she needed to confirm the validity of the votes with Sinovac's Antiguan counsel. *Id.* ¶ 16.

On March 5, 2018, the Former Incumbent Directors caused Sinovac to file an announcement falsely declaring that the Former Incumbent Directors had been re-elected by a majority of the votes validly cast. *Id.* ¶ 17.

### D.    The Self-Dealing SPA and Issuance of PIPE Shares

A dispute ensued regarding who were the duly elected directors of Sinovac, which spawned multiple lawsuits, including in the Antiguan High Court. *Id.* ¶ 18. The Former Incumbent Directors also caused Sinovac to file a lawsuit in the Delaware Court of Chancery against OrbiMed and 1Globe solely because they had voted against the re-election of the Former Incumbent Directors at the AGM, and sought a declaration that such action caused a "Trigger Event" under the terms of the Rights Agreement. *Id.* ¶ 17. Those proceedings, however, would take years to resolve. *Id.* ¶¶ 17-32. In the interim, the Former Incumbent Directors conspired with the Management Consortium, including Prime Success and Vivo, to increase their respective holdings in Sinovac and thereby dilute the holdings of others, including those who voted against them.

On July 2, 2018, the Former Incumbent Directors, purportedly acting on behalf of Sinovac, entered into a securities purchase agreement ("SPA") with Prime Success and Vivo. Pet. ¶ 55; Pet., Ex. 1. Pursuant to the SPA, the Company purportedly issued 5,900,000 common shares to each of Prime Success and Vivo as part of a PIPE priced at $7.35 per share (the "PIPE Shares"). Pet., Ex. 1 § 2.1. Contrary to Prime Success's assertions, the SPA and PIPE issuance was not an

"arms' length transaction" (Mot. at 2). Rather, it was a self-dealing transaction carried out by the Former Incumbent Directors to consolidate the Management Consortium's control of the Company.

The Former Incumbent Directors began planning the private placement transaction in March 2018, just weeks after they falsely announced that they had won re-election at the AGM. The Former Incumbent Directors invited only members of the Management Consortium, including Prime Success and Vivo, to participate in the private placement. Ex. 1 at 39. No other existing shareholders were invited. All along, the PIPE Shares were intended to come with a significant string attached—i.e., participating investors would be required to vote their shares consistent with all recommendations by the Former Incumbent Directors. *Id.* In furtherance of that objective, Prime Success and Vivo dutifully entered into a Shareholder Agreement, also dated July 2, 2018, which required them to vote their newly issued shares consistent with the interest of the Former Incumbent Directors. *Id.* Tellingly, the Former Incumbent Directors purported to amend the Rights Agreement to permit the execution of the SPA and issuance of the PIPE Shares without causing a "Trigger Event." Pet., Ex. 1 at ¶ 3.21.

The economics of the PIPE offering also reflect that it was conducted for an improper purpose. To start, the Former Incumbent Directors did not try to maximize the price of the offer. The price of the PIPE, $7.35 per share, was lower than the $8.00 per share that the Sinobioway Consortium had offered to pay—and lower than the then-current market price, which fluctuated between $7.46 and $8.66 per share in the month leading up to the transaction. Moreover, Sinovac was sitting on $88.1 million in cash and cash equivalents, while being profitable, on the eve of the PIPE transaction, which belies the Former Incumbent Directors' pretextual claim that the Company needed to raise capital. Ex. 2 at 4.

While Prime Success and Vivo now deny that the SPA was too good to be true, they were expressly warned about the dubious authority of the Former Incumbent Directors to enter into the SPA.  Notably, the Disclosure Schedule to the SPA acknowledged "uncertainty as to whether the Board had the power and authority to approve the Securities Purchase Agreement and the transactions contemplated therein and whether the Securities Purchase Agreement constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms." Pet., Ex. 1 at 8.  If it were later decided that the New Directors had been the duly elected directors all along, Prime Success and Vivo understood Sinovac could not be bound by a transaction approved by a board of "imposters," which is exactly what came to pass.

### E.    The Management Consortium Siphons Cash, at the Expense of Sinovac Shareholders, through Its Control of a Subsidiary

On February 18, 2019, the Former Incumbent Directors purported to determine that 1Globe and OrbiMed became "Acquiring Persons" within the meaning of the Rights Agreement at or prior to the AGM, and sought to exercise a "poison pill" depriving those shareholders from receiving certain newly-issued Exchange Shares that all other Sinovac shareholders would receive.  As a direct result of this, on February 22, 2019, NASDAQ halted trading of Sinovac shares. Shareholders were therefore unable to sell their Sinovac shares when the Company developed the leading vaccine against the Covid-19 virus, which yielded billions of dollars in profits for the Company.  Nevertheless, the Management Consortium, including Prime Success, and the Former Incumbent Directors found a way to siphon a large portion of this cash—just for themselves— through their control of a subsidiary entity.

Sinovac Life Sciences Co., Ltd. ("SLS") was an indirect wholly-owned subsidiary of Sinovac until 2020.  Pet. ¶ 10.  SLS conducts human vaccine research, and it is the key operating subsidiary of Sinovac, including because of its development of the "CoronaVac" vaccine.  *Id.*

Starting in May 2020, Prime Success, Vivo and allies in the Management Consortium began to take over control of SLS through self-dealing convertible loan agreements. *Id.* ¶ 61. Prime Success and Vivo each loaned SLS $7.5 million, purportedly to facilitate development of a Covid-19 vaccine, even though the Chinese government had selected SLS as the preferred contractor for such work and, thereby, provided financial and regulatory support to SLS for the rapid development of the vaccine. *Id.* Subsequently, Prime Success and Vivo each converted the loans into a 7.5% equity interest in SLS.

Unbeknown to Sinovac shareholders, since December 2020, at the direction of the Management Consortium, the Former Incumbent Directors caused SLS to pay approximately ***$850 million*** to Prime Success, Vivo, and certain others, while all other undisputed shareholders in Sinovac were paid nothing.

### F.    Privy Council Ruling in January 2025

Eventually, the legal disputes regarding the propriety of the election of directors at the AGM worked their way through the trial and appellate courts, until the issue reached the Privy Council, which is the court of final appeal for Antigua.

The Privy Council's ruling, issued January 16, 2025, unambiguously held that the New Directors were duly elected at the AGM, have been the lawfully appointed directors of Sinovac since February 6, 2018, and the Rights Agreement was invalid. Pet., Ex. 8. On the other hand, as a result of the election at the AGM, the Former Incumbent Directors ceased to hold office as directors on February 6, 2018 and have been, in the express words of the Privy Council "imposters" ever since. *Id.* The Privy Council further held that 1Globe and other shareholders did not do "anything unlawful." *Id.*

### G.    Sinovac Attempts to Clean Up the Mess Left Behind by the Former Incumbent Directors and the Management Consortium

Following the Privy Council's decision, the New Directors engaged in the process of undoing the damage caused by the Former Incumbent Directors and the Management Consortium, while they held *de facto* control of the Company, albeit as "imposters."  Sinovac is committed to restoring proper corporate governance and fulfilling its fiduciary duties to ***all shareholders***. Among its primary objectives, Sinovac is in the process of securing the resumption of trading on NASDAQ and issuing dividends to shareholders, including an upcoming special cash dividend of $55 per share.  Pet. ¶ 73; Pet., Ex. 14.  Sinovac has announced its intention to pay this dividend on or about July 9, 2025.  Pet. ¶ 90; Pet., Ex. 19.

Another important task is unwinding the self-dealing and invalid PIPE transaction that was entered into by the board of "imposters."  The only possible outcome of the Privy Council's January 2025 ruling is that the PIPE transaction was not validly entered into, and the shares issued to Prime Success and Vivo must be canceled.  To obtain this relief—and address the breaches of fiduciary duty committed by the Former Incumbent Directors—on May 6, 2025, Sinovac filed an action in Antiguan court, which is the proper forum to resolve questions about the internal affairs of an Antiguan corporation.  Pet. ¶ 80.

Unsurprisingly, Prime Success and Vivo have resisted Sinovac's attempts to implement proper corporate governance, resulting in a new campaign of litigation across the globe, including the instant proceeding.  All these proceedings have sought to collaterally attack the Privy Council's January 2025 ruling.  For example:

- In March 2025, Vivo commenced arbitration in Hong Kong against the Company, which Prime Success joined as a claimant.  *Id.* ¶¶ 77-78.

- In April 2025, members of the Management Consortium, including Prime Success and/or Vivo and their affiliates, filed legal actions in the U.S. District Courts for

the District of Massachusetts and the Southern District of New York, and the Supreme Court for the State of New York.[2]

- In April 2025, an affiliate of Vivo filed a legal action in the High Court of Justice for Antigua and Barbuda against the Company seeking a declaration that he is a director of the Company and requiring that the current board include him in all board meetings and decisions.  Ex. 3.

- On June 12, 2025, Prime Success filed an application for a stay in the Antiguan court seeking to stay that action in favor of the Hong Kong arbitration, which is the exact same relief it seeks here.  Ex. 4.

- On the night of June 12 and the early morning of June 13, 2025, Prime Success filed the instant petition to prevent the Antiguan action from moving forward, and Prime Success has suggested that one or more additional arbitrations will be commenced in Beijing, China.  Pet. ¶ 84, n.5.

While the PIPE shares are invalid and ultimately will be canceled, Sinovac has announced its intention to, and now has, deposited with Equiniti, an independent third party, the dividends that would be payable to Prime Success and Vivo for those PIPE shares, pending resolution of the issue in Antiguan court.  Pet., Ex. 14.  *In other words, as Prime Success well knows, the emergency it claims—that its share of dividends will imminently be distributed to other shareholders—is entirely false.*

## ARGUMENT

### I.    PRIME SUCCESS IS NOT ENTITLED TO INJUNCTIVE RELIEF

Injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted."  *Med. Soc'y of the State of N.Y. v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977).  To obtain an injunction, a movant must establish the following factors: "(1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not

---

[2] *See Vivo Cap. Surplus Fund VIII, L.P. v. 1Globe Cap. LLC*, No. 1:25-cv-10914 (D. Mass) (complaint filed April 14, 2025); *Vivo Capital Surplus Fund VIII, L.P. v. OrbiMed Advisors LLC*, No. 1:25-cv-03051 (S.D.N.Y.) (complaint filed April 14, 2025); *Vivo Cap. Fund VIII, L.P., v. Sven H. Borho*, No. 652489/2025 (N.Y. Sup. Ct.) (complaint filed April 22, 2025).

granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief." *Global Net Lease, Inc. v. Blackwells Cap. LLC*, 2023 WL 3222417, at *3 (S.D.N.Y. May 3, 2023). Prime Success has not met, and cannot meet, its burden as to any factor; its request for injunctive relief must be denied. *See Empresa Generadora De Electricidad Itabo v. Corporacion Dominicana De Empresas Electricas Estatales ("CDEEE")*, 2005 WL 1705080, at *8 (S.D.N.Y. July 18, 2005) (denying anti-suit injunction where petitioner "has not met its 'heavy burden' of establishing irreparable harm").

A.    **Prime Success Cannot Show Irreparable Harm**

"To satisfy the irreparable harm requirement, [the movant] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). The movant is required to prove not a mere possibility of irreparable harm, but that it is "*likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Johnson as Tr. of Johnson Fam. Tr. v. Saba Cap. Mgmt., L.P.*, 2023 WL 1345717, at *4 (S.D.N.Y. Jan. 31, 2023).

Prime Success does not need a TRO from this Court to pursue arbitration. Mot. at 17. In fact, Prime Success is currently pursuing arbitration and has moved to stay the Antiguan litigation pending the arbitration. *See* Ex. 4. Because "[n]either [the foreign] court has awarded the relief sought by [defendant] or directed the outcome(s) of which [plaintiff] complains," "any harm to [plaintiff] is speculative" and this Court need not act. *CDEEE*, 2005 WL 1705080, at *9 (denying preliminary injunction in aid of arbitration). If Prime Success prevails in Antigua and in arbitration, then the arbitration panel could uphold Prime Success's shareholder status and award

the allegedly lost dividends.  Where, as here, an arbitration panel can remedy the underlying purported harm, there is no loss of the right to arbitrate.  *See Vencosul N.V. v. TIM Int'l N.V.*, 2003 WL 21804833, at *1, *4 (S.D.N.Y. Aug. 6, 2003) (rejecting argument that "loss of shareholder rights" is irreparable harm because plaintiff could "pursue its claim in the arbitral forum"); *Emirates Int'l Inv. Co., LLC v. ECP Mena Growth Fund, LLC*, 2012 WL 2198436, at *7 (S.D.N.Y. June 15, 2002) (denying preliminary injunction; "to the degree that the arbitrators eventually find that the petitioner is entitled to some award, there is no showing that the petitioner cannot be made whole").[3]

Nor will Prime Success be "deprive[d] . . . of its shareholder rights" without a TRO.  Mot. at 17-18.  If the July 8, 2025 stockholder meeting proceeds without Prime Success and Prime Success prevails in Antigua and in arbitration, the results of the stockholder vote could be recalculated after including Prime Success's shares.  Thus, arbitral relief after the vote would be a complete remedy for Prime Success and Prime Success would not suffer irreparable harm absent a TRO.[4]

---

[3] By contrast, Prime Success's cited cases involved situations where the underlying harm could not be remedied by arbitrators.  *See Credit Suisse Sec. (USA) LLC v. Ebling*, 2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006) (solicitation of clients and employees in violation of non-solicitation clause could not be undone by arbitrator); *Genius Grp. Ltd. v. LZG Int'l, Inc.*, 2025 WL 815346, at *6 (S.D.N.Y. Mar. 13, 2025) (preliminarily enjoining "activity that could ***irreversibly*** alter the status quo before the arbitrator can render a decision" (emphasis added)); *Storm LLC v. Telenor Mobile Commc'ns AS*, 2006 WL 3735657, at *13 (S.D.N.Y. Dec. 15, 2006) (arbitrators could not undo harm caused when it was "impossible for . . . company . . . to function" or caused by the "threat of criminal sanctions"); *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, at *1, *4 (S.D.N.Y. Dec. 10, 2003) (arbitration could not undo harm caused by 50% owners losing their controlling stake of company).

[4] Prime Success's cited cases are clearly distinguishable because there the plaintiffs alleged that the defendants issued misleading statements the impact of which would have been impossible to calculate on the stockholder vote after the fact.  *See Krauth v. Executive Telecard Ltd.*, 890 F. Supp. 269, 287 (S.D.N.Y. 1995) ("Irreparable injury results from the use of false and misleading proxies"); *Lichtenberg v. Besicorp Group Inc.*, 43 F. Supp. 2d 376, 390 (S.D.N.Y. 1999) (irreparable harm from "vot[ing] on the basis of a materially misleading Proxy").

Prime Success's argument about the upcoming cash dividend is even weaker. Mot. at 18. Loss of a **monetary** dividend is just **monetary** harm for which **monetary** damages can compensate. *See SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 84 (2d Cir. 2000) (no irreparable harm for preliminary injunction in aid of arbitration "given the availability of money damages should the clause [at issue] be found enforceable").[5] In any event, contrary to Prime Success's assertion (Mot. at 18), Sinovac **has already securely deposited** the funds at issue in an escrow account with Equiniti. *See* Pet., Ex. 14 ("an amount equal to the aggregate amount of cash that would be payable under the Dividend in respect of the 2018 PIPE Shares, will, prior to the payment date, be set aside and retained by the Company pending final resolution of any issues with respect to the 2018 PIPE Shares"). It is thus entirely false for Prime Success to claim that any purported dividends it is owed "may be paid to other shareholders." Pet. ¶ 4. **Therefore, Prime Success is at no risk of losing any dividend without a TRO**.

Finally, Prime Success argues that the parties agreed to an irreparable harm provision in the SPA. Mot. at 18. But that provision does not apply here because Prime Success has not pleaded a cause of action for breach of any contract. *See* Pet. ¶¶ 93-100. Further, Prime Success's own cited case acknowledges that such a provision is "not controlling." *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 896 (2d Cir. 2015). Where, as here, "the record does not establish that a preliminary injunction is necessary to avoid irreparable harm to [plaintiff] in advance of the arbitrator's final judgment," the injunction is appropriately denied notwithstanding an irreparable harm clause. *See M.B. Int'l W.W.L. v. PMI Am., Inc.*, 2012 WL 3195761, at *12-13 (S.D.N.Y. Aug. 6, 2012) (no irreparable harm where plaintiff "failed to show that there is an imminent risk

---

[5] Prime Success's cited case is inapposite, as the dividend there was not a **monetary** dividend. *See Unilever Acquisition Corp. v. Richardson-Vicks, Inc.*, 618 F. Supp. 407, 410 (S.D.N.Y. 1985).

that [defendant] will violate" the provisions at issue "before the arbitrators have the opportunity to act").

### B.    Prime Success Cannot Demonstrate a Likelihood of Success on the Merits

Because Prime Success has "failed to establish that [it] would suffer irreparable harm in the absence of an injunction, there is no need to reach" the likelihood of success on the merits. *CDEEE*, 2005 WL 1705080, at *9. But in the event the Court does reach this question, Prime Success has failed to make such a showing.

The Court must decide whether Petitioner is likely to prevail on the merits of the dispute in the underlying arbitration. *See Messih*, 224 F.3d at 84 ("The likelihood of success is thus measured in terms of the likelihood of success in arbitration"); *Espiritu Santo Holdings, LP v. L1bero Partners, LP*, 2019 WL 2240204, at *17 (S.D.N.Y. May 14, 2019) (same), *aff'd*, 789 F. App'x 288 (2d Cir. 2020); *Thales Avionics, Inc. v. L3 Techs., Inc.*, 719 F. Supp. 3d 337, 345 (S.D.N.Y. 2024) (considering the merits of the claims brought in an ICC arbitration). Since "arbitration is frequently marked by great flexibility in procedure, choice of law, legal and equitable analysis, evidence, and remedy . . . ***this element of the analysis will naturally have greatly reduced influence***." *Messih*, 224 F.3d at 84 (emphasis added).[6]

---

[6] Petitioner attempts to reframe the analysis and cast the likelihood of success question as whether the Antiguan case "ran afoul" of the SPA arbitration clause. *See* Mot. at 11. But that is not a question before the Hong Kong arbitrators. Petitioner is seeking an injunction "in aid of arbitration," so the underlying merits of the arbitration are relevant. If Petitioner is arguing that the appropriate question is the likelihood of success on this Petition, that is circular reasoning. Prime Success does not assert any causes of action here beyond the request for emergency injunctive relief. In any event, Prime Success is not likely to succeed here for the multitude of reasons set forth in this opposition brief. Prime Success's case on this issue ignores binding Second Circuit authority and is also distinguishable. *Forbes IP (HK) Ltd. v. Media Bus. Generators*, 2024 WL 1743109, at *7 (S.D.N.Y. Apr. 23, 2024) (party breached New York forum selection clause by obtaining *ex parte* injunction in Mexico).

Petitioner is unlikely to succeed in arbitration for multiple reasons. *First*, the SPA containing the Hong Kong arbitration provision was void *ab initio*. Prime Success alleges that it received its shares in July 2018 through the SPA. Pet. ¶ 4. But that agreement was entered into during a time when the board of directors of Sinovac that purported to authorize the transaction were "imposters," as the Privy Council held. *See* Pet., Ex. 8 at 26. Thus, the SPA is invalid, and the arbitration provision contained therein is invalid. There is no valid agreement to arbitrate at all.[7]

Second, even if the SPA somehow were valid, the Privy Council judgment qualifies as a "rescission order" under the SPA. Prime Success was well aware of the contested status of the Sinovac board when it executed the SPA. Section 3.2(A) of the disclosures, states "such determination [that the Former Incumbent Directors lost the board election] **could create uncertainty as to whether the Board had the power and authority to approve the Securities Purchase Agreement** and the transactions contemplated therein and **whether the Securities Purchase Agreement constitutes a valid and binding obligation** of the Company, enforceable against the Company in accordance with its terms." Pet., Ex. 1 at 8 (emphasis added).

Indeed, Prime Success and Vivo negotiated protections for themselves because of this very risk. Section 6.13 of the SPA explicitly provides for "remedies in event of rescission event." *Id.* at 34. Section 6.13 provides that the SPA would be rescinded if "a court of competent jurisdiction enters an Order (whether in connection with the Pending Litigation or any other Proceeding)

---

[7] Prime Success's arguments on the merits, including that it is likely to succeed in Hong Kong because Sinovac's CEO signed the agreement "in his capacity as the head of management—not a director" (Mot. at 14) should be ignored. Prime Success cites no authority in support of its positions, let alone Hong Kong authority, and indeed the SPA states that the agreement is governed by "the Laws of Hong Kong." Pet., Ex. 1 at 33. If Hong Kong law does not apply, then Antiguan law applies since Sinovac is incorporated in Antigua.

determining on the merits . . . that (i) this Agreement, the other Transaction Documents or the Transactions were not duly authorized or approved by the Board, and/or (ii) the Shares were not validly issued or sold to the Investors as contemplated by this Agreement (a 'Rescission Order')." *Id.* (emphasis added). It is worth noting that Prime Success itself envisioned that a "court," not an arbitration, had "jurisdiction" over these issues. What Prime Success anticipated has now come to pass with the Privy Council judgment.[8]

> *Third*, Sinovac plans to file an application for a stay in the Hong Kong arbitration. The issue of the validity of the SPA and the purported allotments of shares to Prime Success and Vivo are matters of Antiguan law. These are issues that affect the interests of all the shareholders in Sinovac, including OrbiMed and 1Globe, which are not parties to, and cannot be bound by, the arbitration. Only the courts of Sinovac's place of incorporation, Antigua and Barbuda, can make a determination that is binding on all the shareholders of Sinovac. *See, e.g.*, *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996) ("[T]he internal affairs of corporations are decided in accordance with the law of the place of incorporation.").[9]

### C.    The Balance of Hardships and the Public Interest Do Not Support Injunctive Relief

As an independent basis to reject Prime Success's Petition, a party is not entitled to a preliminary injunction unless the balance of hardships tips in its favor (or tips "decidedly" combined with a showing of "sufficiently serious questions going to the merits"). *MyWebGrocer,*

---

[8] Petitioner contends that the Privy Council "did not change the status quo as to Prime Success's shareholder rights," (Mot. at 13), but that is the necessary effect of the Privy Council's determination that the Sinovac directors who approved the SPA were "imposters." In any event, the question is properly before the Antiguan court.

[9] Indeed, in recognition of the Antiguan court's jurisdiction over these matters, Shan Fu, Vivo's former board designee filed a case in Antigua seeking to litigate related issues about whether he remains a director after the Privy Council's ruling. Ex. 3.

*LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004).  Where the balance is merely equal, no injunction is warranted.  *Id.* at 194.  Here, the balance of hardships and equities weighs heavily in Respondents' favor.

Prime Success has asked the court in Antigua for the same relief it seeks here—a stay of the Antiguan action in favor of the Hong Kong arbitration.  Indeed, in Prime Success's Antiguan papers, it seeks an order that the "claims brought by the Company . . . be stayed pursuant to the Court's case management powers and/or the Court's inherent jurisdiction pending determination of the (1) *the ongoing HK Arbitration* (as defined below) between the Company and the Applicant herein and (2) the anticipated PRC Arbitrations (as defined below)."  *See* Ex. 4 (emphasis added).  It is the height of gamesmanship and forum shopping for Prime Success to now seek the same relief in the Southern District of New York.  What if this Court and the Antiguan court issue inconsistent orders on the same issue?

Moreover, Prime Success and its affiliates' conduct over the past decade in which they have repeatedly and brazenly enriched themselves at the expense of Sinovac's shareholders amounts to "unclean hands"—*i.e.*, "inequitable conduct or bad faith where the misconduct has a material relation to the equitable relief that plaintiff seeks"—which precludes a preliminary injunction.  *See Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 533 (S.D.N.Y. 2009); *see also Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 886 F. Supp. 1120, 1130–31 (S.D.N.Y. 1995) (unclean hands "tip the balance of the equities strongly against [that party]").  Such conduct includes the unauthorized PIPE transaction, scheming with the Former Incumbent Directors to deploy an invalid Rights Agreement to try to entrench power over Sinovac, and receipt of hundreds of millions of dollars in dividends that were denied to nearly all of Sinovac's other shareholders to this day.

On the public interest factor, while there is a strong U.S. policy of enforcing arbitration clauses, "there is an equally strong United States policy against interfering with proceedings before a foreign sovereign." *Laif X Sprl v. Axtel, S.A. de C.V.*, 310 F. Supp. 2d 578, 581 (S.D.N.Y. 2004), *aff'd*, 390 F.3d 194 (2d Cir. 2004). Since Prime Success has already asked the Antiguan court to resolve the same question, there is no reason for this Court to interfere with those proceedings. Prime Success's abuse of the U.S. legal system is not in the public interest.

## II.    PRIME SUCCESS DOES NOT SATISFY THE REQUIREMENTS FOR AN ANTI-SUIT INJUNCTION

An anti-suit injunction is an even more extraordinary remedy than a preliminary injunction, and courts in the Second Circuit require additional factors to be satisfied. *See China Trade*, 837 F.2d at 35-36. "[T]he Second Circuit takes a ***restrictive view*** of such injunctions, cautioning courts to use them only in relatively ***extreme circumstances***." *Laif X Sprl*, 310 F. Supp. 2d at 581 (emphasis added).

An anti-suit injunction is especially extraordinary in this case, where an injunction would interfere with the jurisdiction of the Antiguan court that has been overseeing related litigation, off and on, for seven years, and where there is no U.S. proceeding to protect. *See China Trade*, 837 F.2d at 36 ("an anti-foreign-suit injunction should be used sparingly and should be granted only with care and great restraint"). "Principles of comity weigh heavily in the decision to impose a foreign anti-suit injunction." *LAIF X SPRL*, 390 F.3d at 200. Although the anti-suit injunction is directed at the parties in the suit rather than the foreign court, "such an order effectively restricts the jurisdiction of the court of a foreign sovereign." *China Trade*, 837 F.2d at 35. "When two sovereigns have concurrent *in personam* jurisdiction one court will ordinarily not interfere with or try to restrain proceedings before the other." *Id.* at 36. "[I]nternational comity demands that this extraordinary remedy be used only after other means of redressing the injury sought to be avoided

have been explored." *United States v. Davis*, 767 F.2d 1025, 1038 (2d Cir. 1985). Accordingly, any consideration of whether to grant an anti-suit injunction must be guided by the "need for due regard to principles of international comity." *China Trade*, 837 F.2d at 35.

To succeed on an anti-suit injunction, Prime Success must show that (1) the parties are "the same in both matters" and (2) that resolution of the case before this court is "dispositive of the action to be enjoined." *Id.* To start, Prime Success cannot meet the threshold factors, and, therefore, issuance of an anti-suit injunction is inappropriate. Even if the threshold requirements were met, the discretionary factors weigh against issuance of an anti-suit injunction.

### A.    Prime Success Does Not Satisfy the Threshold Requirements for an Anti-Suit Injunction

Prime Success has failed to satisfy the threshold requirements for this Court to grant an anti-suit injunction. Prime Success is not entitled to the "extraordinary remedy" of an anti-suit injunction because it cannot show that: (1) the parties are "the same in both matters" and (2) resolution of the case before this court is "dispositive of the action to be enjoined," as is required for an anti-suit injunction to issue. *Id.*

### 1.    This Action and the Antiguan Action Involve Different Parties

To meet the threshold requirement that the parties are "the same in both matters," Prime Success must show "substantial similarity" between the named parties in this action and the Antiguan action. *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 404 (S.D.N.Y. 2018) (citation omitted). "[A]bsent extraordinary circumstances, [anti-suit] injunctions should ordinarily be limited to situations where foreign litigation entirely duplicates domestic litigation." *Id.* Here, of course, there is no underlying domestic proceeding—only Antiguan and Hong Kong proceedings.

Prime Success concedes, as it must, that Vivo is not a party to this action. Nor does Vivo have any affiliation to a party to this action. Prime Success argues that "Vivo's involvement in Antigua is not necessary to the relief Respondents seek against *Prime Success* in Antigua, and Petitioner only seeks an order requiring Respondents to withdraw their claims *against Prime Success.*" Mot. at 21. But Respondents' action in Antigua cannot proceed against Vivo without Prime Success's involvement given that Vivo and Prime Success are similarly situated and both own PIPE shares that are invalid. *See ICBC Standard Securities, Inc. v. Luzuriaga*, 217 F. Supp. 3d 733, 742 (S.D.N.Y. 2016) (holding that additional defendant in foreign action precluded issuance of anti-suit injunction); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 950 F. Supp. 48, 54 (E.D.N.Y. 1996) (denying request for anti-suit injunction where two parties in a French action were not present in the U.S. action), *aff'd*, 126 F.3d 365 (2d Cir. 1997). Given that Prime Success and Vivo are both at the center of the dispute before the Antiguan court, Respondents' lawsuit in Antigua must involve both Prime Success and Vivo. In addition, Equiniti Trust Company, LLC— a transfer agent—is not a party to the Antigua action. Nor is Equiniti affiliated with any parties to the Antiguan action.

### 2.    This Action Is Not Dispositive of the Antiguan Action

Next, Prime Success must establish that "resolution of the case before the enjoining court [ ] be dispositive of the enjoined action." *China Trade*, 837 F.2d at 36. An action cannot be dispositive of a foreign proceeding if the foreign proceeding involves additional parties. *WTA Tour*, 339 F. Supp. 3d at 405 (S.D.N.Y. action not "dispositive of the Romanian or Spanish actions, since those suits involve additional parties who might be entitled to independent relief").

Prime Success argues that an anti-suit injunction in this action would be dispositive of the Antiguan action, but Prime Success concedes that it "only seeks an order requiring Respondents to withdraw their claims *against Prime Success*" in Antigua. Mot. at 21. In other words, even if

an anti-suit injunction were issued enjoining Respondents from prosecuting claims against Prime Success in the Antiguan lawsuit, the Antiguan lawsuit would still proceed against Vivo. This action would thus not be dispositive of the Antiguan case.

Further, this action and the Antiguan action involve different forms of relief. Prime Success seeks an anti-suit injunction in this case. In the Antiguan action, Respondents seek, among other things, a declaration that the SPA and related agreements are invalid and that Prime Success and Vivo's PIPE Shares be set aside. Additionally, to the extent there is any uncertainty as to the dispositive nature of this action, this would be a further basis to deny the anti-suit injunction. *See Space Imaging Europe, Ltd. v. Space Imaging L.P.*, 1999 WL 511759, at *6-7 (S.D.N.Y. July 19, 1999) (denying anti-suit injunction where "at best, it is unclear whether the Court's resolution of this action is dispositive of the action to be enjoined").

### B.    Discretionary Factors Also Weigh Against Issuance of an Anti-Suit Injunction

Even if Prime Success could satisfy the two threshold requirements, this Court must consider five equitable factors: "(1) frustration of a policy in the enjoining forum; (2) [whether] the foreign action would be vexatious; (3) [whether the foreign proceedings present] a threat to the issuing court's in rem or quasi in rem jurisdiction; (4) [whether] the proceedings in the other forum prejudice other equitable considerations; or (5) [whether] adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment." *China Trade*, 837 F.2d at 35. "Of these factors, the first and third are the most important." *In re SKAT Tax Refund Scheme Litig.*, 2020 WL 400718, at *5 (S.D.N.Y. Jan. 23, 2020). Here, consideration of all five factors weigh against issuing an injunction.

*First*, the Antiguan action does not undermine any policy interest of this Court. New York has nothing to do with the years-long litigation unfolding in Antigua. Further, the Antiguan action has not obstructed the Hong Kong arbitrations. *See Cybernaut Cap. Mgmt. Ltd. v. Partners Grp.*

*Access Secondary 2008, L.P.*, 2013 WL 4413754, at *5 (S.D.N.Y. 2013) (denying anti-suit injunction where the Respondent did not seek to "sidestep arbitration"); *CDEEE*, 2005 WL 1705080, at *9 (denying anti-suit injunction and motion to compel arbitration where the "suits in the Dominican Republic do not appear 'materially [to be] delaying, or even directly interfering with, the ongoing arbitration, for both are proceeding simultaneously.'"); *see also C.D.S., Inc. v. Bradley Zetler, CDS, LLC*, 213 F. Supp. 3d 620, 629 (S.D.N.Y. 2016) (denying anti-suit injunction where "allowing the parties to continue litigating in [the foreign jurisdiction] does not frustrate important United States policy").  As things stand, both the Hong Kong arbitration and the Antiguan action are proceeding in parallel.

*Second*, Respondents' lawsuit in Antigua is not vexatious.  Antigua is the forum that should resolve questions of Antiguan corporate law and governance, such as whether Prime Success is a valid shareholder of an Antiguan company.  The Second Circuit has observed that "[p]arallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other."  *China Trade*, 837 F.2d at 36; *see also Hamilton Bank, N.A. v. Kookmin Bank*, 999 F. Supp. 586, 590 (S.D.N.Y. Apr. 15, 1998) (denying anti-suit injunction, in part, because "[t]here is nothing vexatious about the Korean action; [Respondent] Kookmin, a Korean bank, quite understandably has sought relief from its own courts just as [Petitioner] has done here").

*Third*, the Antiguan action does not threaten this Court's jurisdiction.  There is no domestic proceeding, let alone a New York proceeding, that needs to be protected.

As to the fourth and fifth factors, any argument that the Antiguan action unfairly prejudices Prime Success is speculative given that both the Antiguan action and the Hong Kong arbitration are at similarly early stages of litigation.  In fact, by initiating the instant action, Prime Success

may itself be responsible for "delay, inconvenience, expense, inconsistency." Respondents commenced the Antiguan action on May 6, 2025, and the Antiguan court has not issued any rulings. There is thus no prejudice to Prime Success. Even if the Antiguan action moves at a faster pace than the Hong Kong proceeding, that alone is not sufficient reason to disregard concerns of international comity and an Antiguan court's appropriate jurisdiction over claims involving an Antiguan company that have been litigated in Antigua and up to the Privy Council for seven years. *See CDEEE*, 2005 WL 1705080, at *9 ("The possibility of an 'embarrassing race to judgment' or potentially inconsistent adjudications does not outweigh the respect and deference owed to independent foreign proceedings.") (quoting *Laker Airways Ltd. v. Sabena*, 731 F .2d 909, 928–29 (D.C. Cir. 1984)). Accordingly, the discretionary factors weigh against issuance of an anti-suit injunction.

## III.   THIS IS THE WRONG FORUM FOR THE PETITION UNDER THE *FORUM NON CONVENIENS* DOCTRINE

Courts within the Second Circuit apply a three-step analysis in determining whether to invoke *forum non conveniens*: "First, the Court determines the degree of deference it should give a plaintiff's choice of forum. Second, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Third, if an adequate alternative forum exists, the Court balances the private and public factors implicated in the choice of forum." *Touro Coll. v. Fondazione Touro Univ. Rome Onlus*, 2017 WL 4082481, at *13 (S.D.N.Y. Aug. 31, 2017), *aff'd*, 738 F. App'x 25 (2d Cir. 2018) (internal citations omitted).

As an initial matter, Prime Success's choice of forum should not be afforded any deference because this action represents textbook forum shopping: an attempt by a Cayman Islands-registered petitioner (Pet. ¶ 8) to gain tactical advantage with respect to a foreign proceeding in Antigua concerning the corporate affairs of a company incorporated in Antigua

(Sinovac) by bringing an anti-suit injunction in New York. "'Less deference' is afforded a foreign plaintiff's choice of a United States forum" because "a plausible likelihood exists that the selection was made for forum-shopping reasons." *Touro*, 2017 WL 4082481, at *13 (internal citations omitted). Here, Prime Success's forum shopping is not merely "plausible"—it is patently obvious from the fact that Prime Success is already participating in the pending Antiguan proceeding and ran to the New York courts for the express purpose of attempting to enjoin that proceeding. *See Aenergy, S.A. v. Republic of Angola*, 31 F.4th 119, 128-29 (2d Cir. 2022) (affording "minimal deference" to plaintiff's choice of forum, and affirming that it "smacks of forum shopping," where plaintiff brought suit in New York after it had "not found success" in foreign proceedings). Indeed, on June 12, 2025—*i.e.*, the same day it sought an injunction in this Court—Prime Success made an application to the Antiguan court seeking to stay the Antiguan proceeding in favor of the Hong Kong arbitration. *See* Ex. 4.

It is also appropriate not to afford Prime Success any deference because "[t]he core operative facts . . . arise from the management and governance of [a foreign company] in [that country] under [that country's] law," particularly where—as here—the dispute concerns "matters of corporate governance that implicate the legal interests of countless third-party shareholders *around the world*, not just those litigants now before the Court." *Stevenson v. Thornburgh*, 2024 WL 645187, at *26 (S.D.N.Y. Feb. 14, 2024) (emphasis in original); *see also Aenergy, S.A. v. Republic of Angola*, 2021 WL 1998725, at *9 (S.D.N.Y. May 19, 2021), *aff'd*, 31 F.4th 119 (2d Cir. 2022) ("Courts routinely have little sympathy for plaintiffs . . . who conduct business in foreign lands and later try to cry foul here.").[10]

---

[10] Prime Success's argument that "funds" allegedly "reside" in New York (Mot. ¶ 3; Pet. ¶ 28) is irrelevant. *See Aenergy, S.A.*, 2021 WL 1998725, at *19 ("Were such a minimal contact with New York to be deemed significant, this Court, located in one of the world's largest and busiest

The second step of the *forum non conveniens* analysis is to determine whether an adequate alternative forum exists. An alternative forum "is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Touro*, 2017 WL 4082481, at *14. Based on that standard, it is indisputable that Antigua is an adequate alternative forum and easily satisfies both required factors. Indeed, Prime Success seeks relief not despite the existence of an alternative forum in Antigua, but precisely because of that alternative forum and the possibility that the Antiguan court may not rule in Prime Success's favor. *See* Mot. at 22 (arguing that "the Antiguan proceedings" must be "enjoined"). There is no issue about amenability to service, as it is the proceeding ***filed by*** Respondents that Prime Success is seeking to enjoin. Pet. ¶ 80.

Moreover, Prime Success cannot be heard to challenge whether Antigua permits litigation of the subject matter of the Petition, at the same time that Prime Success is urging the Antiguan court to stay the Antiguan proceeding in favor of the Hong Kong arbitration—the same relief sought in this Petition. *See* Ex. 4 ¶ 1. Nor should Prime Success be heard to suggest (Mot. at 22) that litigation of these issues in Antigua is somehow contrary to public policy. While Prime Success invokes the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") as a basis for relief (Pet. ¶¶ 1, 6), it neglects to mention that Antigua and Barbuda also ratified the Convention,[11] and Prime Success itself is arguing in the Antiguan action for a stay pursuant to Antigua's Arbitration Act of 1975. *See* Ex. 4 ¶ 1. But even if the procedures

---

financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York.").

[11] *See* https://www.newyorkconvention.org/contracting-states. Courts may take judicial notice of information on public websites "as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015).

in Antiguan courts differ from those in a U.S. court (which Prime Success has not established), the alternative forum need not provide "precisely the same remedies and in the same time-frame." *Borden, Inc. v. Meiji Milk Prods. Co., Ltd.*, 919 F.2d 822, 829 (2d Cir. 1990) (affirming dismissal on *forum non conveniens* grounds in action seeking an injunction in aid of arbitration); *see also Hyundai Merchant Marine Co., Ltd. v. Mitsubishi Heavy Industries, Ltd.*, 2015 WL 7758876, at *4 (S.D.N.Y. Dec. 1, 2015) ("such differences do not render [the foreign forum] an inadequate forum" provided that "at least some procedural safeguards are in place and a meaningful remedy is available").

Finally, Prime Success references litigation in Delaware involving the corporate affairs of Sinovac (Pet. ¶ 40), but conveniently neglects to mention that Vice Chancellor Laster stayed that case in recognition that the Antiguan court—and not the Delaware court—was the appropriate forum to resolve such disputes.  In particular, Judge Laster observed that the "***Antigua court is far better situated to resolve this matter than this court***."  *See* Ex. 5 ¶ 8 (emphasis added).  Judge Laster also emphasized that "***[t]his matter presents important issues of foreign law that should be addressed by the Antigua court***."  *See* Ex. 6 at 5 (emphasis added).  The same is equally true here, as the Antiguan court is the best positioned to address the corporate affairs of a company incorporated in Antigua.

Because an adequate alternative forum exists, the Court "need not weigh the private and public interest factors." *Touro*, 2017 WL 4082481, at *14.  In any event, they do not avail Petitioner here. *See*, *e.g.*, *Holzman v. Guoqiang Xin*, 2015 WL 5544357, at *9-10 (S.D.N.Y. Sept. 18, 2015) (balance of interest factors "weigh[s] heavily in favor of the case proceeding in the Cayman Islands" with respect to Cayman Islands corporation headquartered in China).

## CONCLUSION

For the foregoing reasons, the Petition should be denied.

26

Dated: June 16, 2025                    Respectfully submitted,

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**

s/ *Morris J. Fodeman*
Morris J. Fodeman
Sheryl Shapiro Bassin
Alexander Luhring
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: 212-999-5800
Facsimile: 866-974-7329
Email: mfodeman@wsgr.com
Email: sbassin@wsgr.com
Email: aluhring@wsgr.com

*Counsel for Respondents Sinovac Biotech Ltd. and*
*1Globe Capital LLC*

**ALLEN OVERY SHEARMAN STERLING US**
**LLP**

s/ *Matthew L. Craner*
Matthew L. Craner
Daniel Kahn
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-5255
Facsimile: (212) 848-4000
Email: matthew.craner@aoshearman.com
Email: daniel.kahn@aoshearman.com

*Counsel for Respondents OrbiMed Advisors LLC,*
*OrbiMed Capital LLC, and OrbiMed Partners*
*Masters Fund Limited*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1</u>

Pursuant to Local Rule 7.1(c), I hereby certify that this memorandum of law contains 8,746 words, and therefore complies with Local Rule 7.1(c).

Dated: June 16, 2025                     Respectfully submitted,

                                         WILSON SONSINI GOODRICH & ROSATI
                                         Professional Corporation

                                         <u>s/ *Alexander Luhring*</u>
                                         Alexander Luhring
                                         1301 Avenue of the Americas, 40th Floor
                                         New York, New York 10019
                                         Telephone: (212) 999-5800
                                         Facsimile: (866) 974-7329
                                         Email: aluhring@wsgr.com