UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Prime Success, L.P.,<br><br>                              Petitioner,<br><br>                    v.<br><br>Sinovac Biotech Ltd., 1Globe Capital LLC,<br>OrbiMed Advisors LLC, OrbiMed Capital LLC,<br>OrbiMed Partners Master Fund Ltd.,<br><br>                              Respondents,<br><br><br>                    and<br><br><br>Equiniti Trust Company LLC, Cede & Co., and the<br>Depository Trust Company,<br><br>                              Relief Respondents. | 25-CV-4989 (RA)<br><br>OPINION & ORDER |

RONNIE ABRAMS, United States District Judge:

Petitioner Prime Success, L.P., brings this Petition against Respondents Sinovac Biotech
Ltd. ("Sinovac" or the "Company"), 1Globe Capital LLC ("1Globe") OrbiMed Advisors LLC,
OrbiMed Capital LLC, and OrbiMed Partners Master Fund Ltd. (collectively, "OrbiMed"), as well
as Relief Respondents Equiniti Trust Company LLC, Cede & Co., and the Depository Trust
Company, seeking a preliminary injunction in aid of arbitration. Prime Success principally asks
this Court to issue an anti-suit injunction to stay an ongoing action in Antigua in favor of a pending
arbitration in Hong Kong. For the reasons that follow, the Petition is denied.

## BACKGROUND[1]

Sinovac is an Antiguan corporation headquartered in the People's Republic of China, Petition ("Pet.") ¶ 9, that focuses on the research, development, manufacture, and commercialization of vaccines, *id.* ¶ 35.  In February 2018, a group of "activist" Sinovac shareholders, including OrbiMed and 1Globe, attempted to take over the Company. *Id.* ¶ 38.  That attempt initially appeared to fail, and the existing board of directors remained in power (the "Incumbent Board"). *Id.* ¶¶ 38–39.  The activist shareholders filed suit, however, and protracted litigation ensued. *Id.* ¶¶ 39–41.  Seven years later, on January 16, 2025, the United Kingdom's Privy Council—the court of last resort for U.K. overseas territories and Crown dependencies— ruled that the 2018 takeover attempt had, in fact, succeeded under Antiguan law. *Id.* ¶ 69.

Much happened in those intervening seven years.  First, in April 2018—not long after the contested takeover attempt—the Incumbent Board authorized a private investment in public equity ("PIPE") offering to raise capital for research and development. *Id.* ¶ 54.  Through the PIPE offering, in July 2018, Prime Success—a Cayman Islands limited partnership created for the purpose of investing in Sinovac, *id.* ¶ 8—executed a securities purchase agreement ("SPA"), pursuant to which it invested $43.365 million in Sinovac in exchange for 5,900,000 common shares*, id.* ¶ 55.  The SPA, which is governed by Hong Kong law, included a mandatory arbitration provision requiring that "[a]ny dispute, claim, controversy or difference arising out of or in connection with [the SPA] or the transactions contemplated hereby, including any question regarding its existence, validity, interpretation, performance or termination or any dispute regarding any noncontractual obligation arising out of or in connection with it (a 'Dispute'), shall

---

[1] The following facts are drawn from the Petition and the parties' sworn submissions and do not appear to be in dispute.

be determined by arbitration administered by the Hong Kong International Arbitration Centre." *Id.* ¶ 57.

Less than two years later, COVID-19 swept across the world, creating an urgent global need for vaccine research and production—Sinovac's expertise. *Id.* ¶ 59. The Company quickly began to develop a vaccine, and by December 2020, its "CoronaVac" vaccine was approved for emergency use. *Id.* ¶ 67. CoronaVac was an extraordinary success and a boon for the Company. By the end of 2021, it was the most widely used COVID-19 vaccine in the world. *Id.* ¶ 68. Sinovac's profits grew exponentially as a result. *Id.*

On February 28, 2025, following the Privy Council's decision, the activist shareholders' chosen directors were installed as the Company's board of directors (the "New Board"). *Id.* ¶ 70. On March 17, 2025, another investor in the 2018 PIPE offering commenced an arbitration in Hong Kong seeking to confirm the validity of its investment in light of the Privy Council's ruling that the Incumbent Board was illegitimate (the "Hong Kong Arbitration"). *Id.* ¶ 77. Prime Success requested to join that arbitration as a claimant on April 9, 2025, and that request was later approved. *Id.* ¶ 78. Sinovac filed an answer in the arbitration on April 28, 2025. *Id.* ¶ 79.

Meanwhile, on April 1, 2025, the New Board announced it would issue a dividend of $55 per share. *Id.* ¶ 73. At the same time, however, it indicated that it may not honor investments authorized by the Incumbent Board, *id.*, and that Prime Success's pro-rata share of the dividend would be "set aside . . . pending final resolution" of the validity of the investment. Anderson Decl., ECF No. 5, Ex. 14; Pet. ¶ 73. On May 6, 2025, Respondents commenced a lawsuit in Antigua seeking to invalidate Prime Success's investment and to strike it from the shareholder registry (the "Antiguan Action"). *Id.* ¶ 80. Two weeks later, Sinovac announced it would hold a special shareholder meeting on July 8, 2025 to elect a new board of directors. *Id.* ¶ 87. In the same

announcement, it stated its "position" that shareholders whose shares were issued by the Incumbent Board "are not entitled to . . . vote at" the meeting.  Anderson Decl., Ex. 13; Pet. ¶ 87.  Respondents then filed a motion in the Antiguan Action on May 30, 2025, seeking interim relief in advance of the July 8, 2025 shareholder meeting.  *See* Anderson Decl., Ex. 16.  Specifically, they sought an order authorizing them to (1) deny Prime Success the right to vote its shares at the meeting; (2) deny Prime Success the ability to count its shares towards a quorum at the meeting; and (3) deny Prime Success its pro-rata share of the forthcoming dividend.  Pet. ¶ 84.  On June 12, 2025, Prime Success asked the Antiguan court to stay its proceedings pending the outcome of the Hong Kong Arbitration.  *See* Fodeman Decl., ECF No. 26, Ex. 4.  Both motions remain pending as of the date of this Order.

Also on June 12, Prime Success commenced this action, in which it seeks a preliminary injunction in aid of arbitration.  Specifically, it seeks (1) an anti-suit injunction enjoining Respondents from pursuing the Antiguan Action; and (2) an injunction maintaining the status quo with respect to Prime Success's shareholder rights pending the outcome of the Hong Kong Arbitration.  Pet. ¶ 100.  Respondents oppose both requests.  *See* ECF No. 24.  The Court heard oral argument on June 18, 2025.

## DISCUSSION

### I.     Anti-Suit Injunction

Prime Success principally seeks an injunction enjoining Respondents from pursuing the Antiguan Action, which it contends involves issues subject to arbitration—namely, the validity of the SPA.  "[A] federal court may enjoin a party before it from pursuing litigation in a foreign forum."  *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004).  While such an injunction is technically "leveled against the party

bringing the suit, it nonetheless effectively restricts the jurisdiction of the court of a foreign sovereign." *Id.* at 655.[2]  Accordingly, "principles of comity dictate that a foreign anti-suit injunction should be used sparingly and granted only with care and great restraint." *Forbes IP (HK) Ltd. v. Media Bus. Generators, S.A. de C.V.*, No. 23-CV-11168, 2024 WL 1743109, at *4 (S.D.N.Y. Apr. 23, 2024).  Since its seminal decision in *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987), the Second Circuit has instructed that "[a]n anti-suit injunction against parallel litigation may be imposed only if: (A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." *Paramedics*, 369 F.3d at 652.  "Once past this threshold, courts are directed to consider a number of additional factors, including whether the foreign action threatens the jurisdiction or the strong public policies of the enjoining forum." *Id.*

The Court begins with the question of whether the resolution of this case would be dispositive of the Antiguan Action.  Where "[t]he case before the enjoining court . . . concerns the arbitrability of the parties' claims," the question is "whether the ruling on arbitrability is dispositive" of the foreign litigation, "even though the underlying disputes are confided to the arbitral panel and will not be decided by the enjoining court." *Id.* at 653.  In other words, a court must consider whether its "judgment disposes of the foreign action by determining the arbitrability of the issues." *Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06-CV-13157, 2006 WL 3735657, at *7 (S.D.N.Y. Dec. 15, 2006) (Lynch, J.).

Here, Prime Success has not asked the Court to rule on arbitrability—indeed, it has not moved to compel arbitration at all.  Instead, the sole issue before the Court is whether to grant a preliminary injunction in aid of arbitration.  *See* Pet. at ¶¶ 93–100.  "Preliminary injunctions,

---

[2] Unless otherwise indicated, this opinion and order omits all internal quotation marks, citations, footnotes, omissions, emphases, and alterations in quoted text.

however, do not conclusively resolve legal disputes." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025). Thus, even if the Court granted a preliminary injunction, its decision would be neither a "ruling on arbitrability," nor "dispositive" of the issues in the Antiguan Action, *Paramedics*, 369 F.3d at 653, and instead "only a prediction about the merits of the case," *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 107 (2d Cir. 2012). Accordingly, because there is no question before the Court that would dispose of the issues in the Antiguan Action, Prime Success has failed to satisfy a threshold requirement for an anti-suit injunction.

The Court's conclusion is consistent with the overwhelming weight of authority in this district. Indeed, in virtually every case the Court has identified in which an anti-suit injunction was issued in aid of arbitration, the question of arbitrability—including whether that question itself was arbitrable—was either previously or simultaneously before the court.[3] *See, e.g., Paramedics*, 369 F.3d at 653; *Res. Grp. Int'l Ltd. v. Chishti*, No. 23-CV-01760, 2024 WL 4135304, at *3 (S.D.N.Y. Sept. 10, 2024); *Citigroup Inc. v. Sayeg*, No. 21-CV-10413, 2022 WL 179203, at *5–7 (S.D.N.Y. Jan. 20, 2022); *Alstom Chile S.A. v. Mapfre Compania De Seguros Generales Chile S.A.*, No. 13-CV-2416, 2013 WL 5863547, at *2–3 (S.D.N.Y. Oct. 31, 2013); *Bailey Shipping Ltd. v. Am. Bureau of Shipping*, No. 12-CV-5959, 2013 WL 5312540, at *4 (S.D.N.Y. Sept. 23, 2013); *Travelport Glob. Distribution Sys. B.V. v. Bellview Airlines Ltd.*, No. 12-CV-3483, 2012 WL 3925856, at *7–8 (S.D.N.Y. Sept. 10, 2012); *Stolt Tankers BV v. Allianz Seguros, S.A.*, No. 11-CV-2331, 2011 WL 2436662, at *4–5 (S.D.N.Y. June 16, 2011); *Storm*, 2006 WL 3735657, at *7;

---

[3] In the few decisions where arbitrability was not before the court, the parties' agreement either contained a New York forum selection clause, *see Forbes*, 2024 WL 1743109, at *5; *Deutsche Mexico Holdings S.a.r.l. v. Accendo Banco, S.A.*, No. 19-CV-8692, 2019 WL 5257995, at *5–6 (S.D.N.Y. Oct. 17, 2019), or an anti-suit injunction was necessary to protect a federal court's judgment enforcing an existing arbitral award, *see, e.g., Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 123–24 (2d Cir. 2007); *Telecom Bus. Sols., LLC v. Terra Towers Corp.*, No. 22-CV-1761, 2024 WL 689519, at *2 (S.D.N.Y. Feb. 20, 2024); *Suchodolski Assocs. v. Cardell Fin. Corp.*, No. 03-CV-4148, 2006 U.S. Dist. LEXIS 3, at *7–8 (S.D.N.Y. Jan. 3, 2006). Neither circumstance is present here.

*Ibeto Petrochemical Indus., Ltd. v. M/T "Beffen"*, 412 F. Supp. 2d 285, 291–92 (S.D.N.Y. 2005), *order aff'd in part, modified in part on other grounds sub nom. Ibeto Petrochemical Indus. Ltd. v. M/T Beffen*, 475 F.3d 56 (2d Cir. 2007); *SG Avipro Fin. Ltd. v. Cameroon Airlines*, No. 05-CV-655, 2005 WL 1353955, at *2–3 (S.D.N.Y. June 8, 2005).[4]

In contrast, here, Prime Success has not brought a motion to compel arbitration. Nor, it appears, could it. As it conceded at oral argument, any such motion would likely be futile, because Respondents have not refused to participate in the arbitration. *See* Oral Arg. Tr. at 17; *Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004) ("The fact that respondents raised before the [arbitrator] an objection to petitioner's Demand for Arbitration . . . does not constitute a "refusal to arbitrate."); *Laif X Sprl v. Axtel, S.A. de C.V.*, 390 F.3d 194, 199 (2d Cir. 2004). And to the extent the Court has the power to order the relief Prime Success seeks, it declines to do so here. Accordingly, Prime Success's "recourse is to pursue vigorously its claims in the arbitral tribunal," not in this Court. *Itabo*, 2005 WL 1705080, at *8; *see also Laif*, 390 F.3d at 199.

In light of Prime Success's failure to satisfy one of the threshold requirements for an anti-suit injunction, the Court need not address the other requirement, which concerns the identity of the parties. However, even if the threshold requirements were met, the Court would deny relief under the discretionary *China Trade* factors. *Laif X Sprl v. Axtel, S.A. de C.V* is instructive in this

---

[4] Additionally, courts generally decline to issue an anti-suit injunction after denying a motion to compel arbitration. *See, e.g., Symbion Power Holdings LLC v. Bouka*, No. 23-CV-1439, 2023 WL 3266784, at *4–5 (S.D.N.Y. May 4, 2023); *Comverse, Inc. v. Am. Telecommunications, Inc.*, No. 06-CV-6825, 2006 WL 3016315, at *3–6 (S.D.N.Y. Oct. 23, 2006); *Empresa Generadora De Electricidad Itabo v. Corporacion Dominicana De Empresas Electricas Estatales*, No. 05-CV-5004, 2005 WL 1705080, at *8–9 (S.D.N.Y. July 18, 2005); *Laif X Sprl v. Axtel, S.A. de C.V.*, 310 F. Supp. 2d 578, 581 (S.D.N.Y. 2004), *aff'd*, 390 F.3d 194 (2d Cir. 2004). Taken together, these cases suggest that a court's power to issue an anti-suit injunction in aid of arbitration may be ancillary to its power to compel arbitration and enforce arbitration awards—a "belt-and-suspenders" approach of sorts. *See, e.g., Paramedics*, 369 F.3d at 654 ("An anti-suit injunction may be needed to protect the court's jurisdiction once a judgment has been rendered."); Daniel Tan, *Enforcing International Arbitration Agreements in Federal Courts: Rethinking the Court's Remedial Powers*, 47 Va. J. Int'l L. 545, 570 (2007) ("[C]ourts should advance the federal policy by using their jurisdiction to grant protective antisuit injunctions to enforce orders to compel arbitration and orders confirming arbitration awards.").

regard.  In that case, while the parties were engaged in an ongoing arbitration over the validity of one of the respondents' shares in a company, another respondent commenced a suit in Mexico to invalidate the petitioner's shares in the same company, which would have vitiated the petitioner's claims in the arbitration.  *Laif*, 310 F. Supp. 2d at 580.  Judge Rakoff denied the petitioner's motion to compel arbitration of the issues in the Mexican action on the grounds that the respondent was already participating in the arbitration, and further denied its motion to enjoin the Mexican action. *Id.* at 581.  The Second Circuit affirmed, reasoning that "comity militate[d] strongly against an injunction."  *Laif*, 390 F.3d at 200.  It explained:

> "A question has arisen under Mexican law—whether LAIF X is [a] shareholder—and that question has been presented to a Mexican court.  Mexico has a strong interest in determining who is a shareholder of a Mexican corporation and whether particular transactions were permissible under the bylaws of a Mexican corporation."

*Id.*  The same is true here.  Respondents have asked the Antiguan court to determine, as a matter of Antiguan law, whether Prime Success is a lawful shareholder of Sinovac.  Antigua has a "strong interest" in making that determination.  *Id.*[5]  "On the other hand, the legal relationship between a [Cayman Islands] investor and an [Antiguan] enterprise"—headquartered in the People's Republic of China—"in no way implicates the strong public policies of the . . . Southern District of New York."  *Id.*

Accordingly, the application for an anti-suit injunction is denied.

---

[5] As a signatory to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Antigua also has a strong interest in abstaining from adjudicating disputes that are subject to arbitration.  *See* New York Convention, *Contracting States*, https://www.newyorkconvention.org/contracting-states/contracting-states (last visited June 19, 2025).

## II.    Preliminary Injunction Preserving the Status Quo

Prime Success further seeks a preliminary injunction maintaining the status quo pending the Hong Kong Arbitration.  *See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1052–53 (2d. Cir. 1990).  The standard for such an injunction is generally the same as the standard for preliminary injunctions in other contexts.  *See Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125–26 (2d Cir. 1984) (per curiam).  Specifically, to obtain a preliminary injunction, a party must demonstrate: "(1) a likelihood of success on the merits . . . ; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in [the requesting party's] favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  "[T]o satisfy the irreparable harm requirement, [a party] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*

As a threshold matter, having denied Prime Success's request for an anti-suit injunction, the Court will not otherwise issue an injunction that would impair Respondents' ability to take actions authorized by the Antiguan court—which would effectively constitute an anti-suit injunction.  *See Forbes*, 2024 WL 1743109, at *5–6 (issuing anti-suit injunction enjoining the respondent from enforcing an existing order of a foreign court); *Deutsche Mexico Holdings*, 2019 WL 5257995, at *5–6 (same).  The question whether Prime Success stands to suffer irreparable harm therefore depends on whether Respondents are likely to take extra-legal action to deprive it

of its shareholder rights.  Prime Success asserts that Respondents have "threatened" to "us[e] self-help."  ECF No. 30 at 11.  Although it cites little evidence in support of this contention, its concern appears to stem from a handful of statements made by Sinovac in filings with the Securities and Exchange Commission.  *See*, *e.g.,* Pet. ¶¶ 73, 87, 89; Anderson Decl., Exs. 13, 14, 18.  In those filings, Sinovac stated (1) on April 1, 2025, that Prime Success's dividend would "be set aside and retained by the Company pending final resolution of any issues with respect to the 2018 PIPE Shares based on the Board's assessment in accordance with the [Privy Council's] Order and under the laws of Antigua and Barbuda," *id.* Ex. 14; (2) on April 29, 2025, that it was "pursuing the proper legal proceeding which is expected to conclude with the cancellation of the PIPE shares," *id.* Ex. 18; and (3) on May 20, 2025, that, following the Privy Council's order, it would "take the necessary steps to achieve the cancellation of [any] [d]isputed [s]hares," and that its "position is that the [d]isputed [s]hares were not validly issued and that the purported holders of the [shares] are not entitled to . . . vote at, the [July 8, 2025] Special Meeting," *id.* Ex. 13.

These statements do not establish that Respondents are likely to "us[e] self-help" to deprive Prime Success of its shareholder rights.  ECF No. 30 at 11.  To the contrary, they suggest that Respondents will act only to the extent authorized by the Antiguan court—a conclusion further supported by the fact that, on May 30, 2025, Respondents asked that court to rule on an interim basis in advance of the July 8, 2025 shareholder meeting.  *See id.* Ex. 16; Pet. ¶ 84.  The possibility that Respondents may act in contravention of or absent a ruling from the Antiguan court is therefore both speculative and remote.  Moreover, Respondents represent that they have placed the dividend funds—more than $600 million in total—in escrow pending the resolution of the Antiguan Action, further mitigating any risk of harm.  Oral Arg. Tr. at 26–27.  "Without evidentiary support of irreparable harm, the Court would be entering relief as a precautionary

measure, which it cannot do." *Johnson as Tr. of Johnson Fam. Tr. v. Saba Cap. Mgmt., L.P.*, No. 22-CV-4915, 2023 WL 1345717, at *4 (S.D.N.Y. Jan. 31, 2023).

Because Prime Success has not carried its burden of showing a likelihood of irreparable harm, the Court need not reach the other preliminary injunction factors. Accordingly, the motion for a preliminary injunction is denied.

## CONCLUSION

For the foregoing reasons, Prime Success has failed to establish its entitlement to a preliminary injunction in aid of arbitration. Accordingly, the Petition is denied without prejudice. The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

Dated:      June 19, 2025
            New York, New York

_____
Ronnie Abrams
United States District Judge